Banca CREMI, et al., Plaintiffs

v.

Alex. BROWN, et al., Defendants.

Civil No. K–95–1091.

United States District Court,
D. Maryland.

Feb. 5, 1997.

Joseph D. Tydings, Howard Schiffman, and Howard N. Feldman, Washington, DC, for plaintiffs.

Michael R. Klein, and Robert F. Hoyt, Washington, DC, for defendants.

FRANK A. KAUFMAN, Senior District Judge.

Plaintiffs, Banca Cremi, S.A., Institucion de Banca Multiple, Grupo Financiero Cremi and its wholly owned subsidiary, Banca Cremi Grand Cayman (collectively "the Bank"), allege that their investment brokers, defendants Alex. Brown & Sons, Inc. ("Alex. Brown") and its employee, John Isaac Epley ("Epley"), wrongfully caused the Bank to lose over $23 million in connection with certain investments.[1] In this case the Bank has filed claims against Alex. Brown and Epley pursuant to Section 10(b) of the Securities and Exchange Act of 1934 (15 U.S.C. § 78a et seq.) ("Section 10(b)"); Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder

by the Securities and Exchange Commission; under the Maryland Securities Act, MD. CORPS. & ASS'NS CODE ANN. § 11–302(c), and state common law theories of breach of fiduciary duty, negligence, negligent misrepresentation and fraud. Plaintiffs also seek relief against Alex. Brown under Section 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C.A. § 78t. Both federal question and diversity jurisdiction exist in this case. Defendants have moved for summary judgment. For the reasons stated in this Opinion this Court will grant that motion.

I

### A. Facts

Except where otherwise noted, the following facts are undisputed in all relevant and material respects.

### B. The Parties

Banca Cremi is a credit institution incorporated under the laws of Mexico, with its principal place of business in Mexico City, Mexico. Banca Cremi Grand Cayman is a wholly owned subsidiary of Banca Cremi, incorporated under the laws of the Cayman Islands, with its principal place of business in Mexico City, Mexico.

Alex. Brown is a securities brokerage firm, incorporated under the laws of Maryland, with its principal place of business in Baltimore, Maryland. Alex. Brown is a registered broker-dealer. Epley, a citizen of Texas, was vice-president of Alex. Brown's Houston office from April, 1993 until 1995.

### C. The Nature of the Securities at Issue

From 1992 to 1994, the Bank, through Alex. Brown, made a number of investments in what have become widely known as "derivatives." Derivatives are securities whose value are based on their relationship to other securities, such as stocks, bonds or commodities. Although derivatives have existed for years in certain forms, in the early 1990s

---

**1.** This Court notes that the Bank proposes two damages figures ($23,355,920 and $21,837,446) using different calculation methods. However, given the outcome of this case, the Court does not need to inquire into that variation.

both the trading and the complexity of derivatives increased dramatically.

The particular derivatives at issue in this case are collateralized mortgage obligations (CMO's). CMO's are securities in which mortgages are pooled, and the pool then is broken down into several cash flows and sold as separate entities or "tranches." The risk and reward can be allocated among tranches in a wide variety of ways. For example, CMO's typically include a formula for allocating "prepayment risk." When interest rates fall, borrowers tend to prepay their mortgages by refinancing, although a variety of factors make the exact rate of prepayment difficult to predict. When rates rise, prepayment tends to slow, but, again, at an unpredictable rate. Because prepayment can cause the interest which the mortgagee receives over the life of the mortgage to be less than expected, prepayment can cause a mortgage pool to drop in value. CMO's may distribute prepayment risk by giving certain tranches a priority position to the principal cash flows, meaning that in the event of prepayment, those "higher" tranches will receive a return of principal sooner than do "lower" tranches. The "coupon" in other CMO's—the interest received during the life of the bond—will vary from tranche to tranche and/or according to some factor such as interest rates. CMO issuers, which include both the private sector and government-sponsored entities such as the Federal Home Loan Mortgage Corp. (Freddie Mac) or the Federal National Mortgage Association (Fannie Mae), combine those and other factors to create an array of securities with varying risk and return levels.

As will be discussed *infra*, the Bank purchased a variety of CMO's from Alex. Brown, but the six at issue were of two basic types: "inverse floaters" and "inverse IO's." Inverse floaters are floating rate securities with a coupon which moves opposite interest rates. Different inverse floaters have different structures, with key factors including any

cap or floor on the coupon rate and the existence of a multiplier, which determines the sensitivity of the security to changes in interest rates. Inverse IO's are the interest-only portion of an inverse floater. An inverse IO is an especially complex, hybrid security, and investors apparently disagree as to its characteristics in times of rising or declining interest rates. One theory is that inverse IO's are "self-hedging" because, even though the coupon decreases in value when interest rates rise, that decrease is offset by an increase in value resulting from slowed prepayment. Another theory is that the decrease in coupon value will always outweigh the increase as a result of reduced prepayment.

### D. The Decision to Invest and Defendants' Disclosures

Epley's first contact with the Bank came when he solicited the Bank's business in June, 1992. At that time, Epley was working for a different company, MMAR Group.[2] Over the next two to three months, Bank officials engaged in numerous discussions with Epley as they continued to study the possibility of investing in CMO's.

Plaintiffs allege that, before they made their first CMO trade, they told defendants of their conservative investment criteria, namely: (1) low risk to capital, (2) high liquidity for (3) short periods (generally, 90–180 days), (4) with a reasonable expectation of a good yield. Although defendants dispute those factual claims, for the purposes of summary judgment, this Court will assume that the Bank appropriately so communicated those criteria to Epley and Alex. Brown.

Defendants disclosed to the Bank's representatives both the general nature and riskiness of CMO's and, to a lesser extent, the characteristics of the particular securities purchased by the Bank. Those disclosures included the following:

---

**2.** MMAR Group is not a party to this case. Epley began working for Alex. Brown in April, 1993. However, Alex. Brown does not attempt to isolate the communications made by Epley during his employment with MMAR Group from those he made while he worked for Alex. Brown. "[A]ll that defendants had disclosed, and all that

Banca Cremi learned and did regarding CMOs before August 30, 1993, is germane to the issues of disclosure, suitability and sophistication." Mot. for Summ.J. at 28. Accordingly, this Court will treat Epley's pre-Alex. Brown communications to the Bank as continuing into his employment with Alex. Brown.

● A pamphlet titled "MMAR Group Guide to CMO Structures," which described CMO's and, in particular, inverse floaters and inverse IO's in some detail. The pamphlet included the statement that inverse floaters "have the potential for significant yield volatility" and described the key factors of inverse floaters, including the cap and floor on the coupon rate and the effect of the multiplier on the sensitivity of the security to changes in interest rates.[3] It described the basic characteristics of inverse IO's and said that they "can perform well in both rising and falling interest rate environments" because of a "self-hedging feature." The guide cautioned that "[p]rices of inverse IO's can be extremely volatile."[4]

● A pamphlet titled "Guide to Inverse IO's," which said that inverse IO's were suitable for the "aggressive investor."[5]

● A sample CMO prospectus with boilerplate language describing various risks, including price, yield and certain liquidity risks.[6]

● A July 22, 1992 letter from Epley to Monica Buentello of the Bank discussing the four elements of risk commonly associated with inverse floaters: credit risk, coupon risk, price volatility and liquidity. That letter indicated that credit risk was nonexistent but that coupon, price and liquidity risk existed. The letter downplayed the extent of those risks—particularly liquidity risk.[7]

● Yield matrices, which typically were provided to the Bank with each proposal made by defendants. Those matrices demonstrated the expected change in yield with changes in interest rates.

The Bank received all those materials. The Bank also had available to it and to its employees a number of other books, pamphlets and articles describing CMO's in detail. One such item, a Barron's article titled "The Pinocchio Security: Here's the Awful Truth About CMOs," which was sent to the Bank by a concerned investor prior to the purchase of any of the CMO's at issue herein, described the dangers of CMO investments.[8] Defendants also made Professor Frank J. Fabozzi, a leading expert on CMO's, available to the Bank as a consultant.

An internal Bank memorandum ("the Approval Memorandum"), which was prepared with Epley's assistance, also discussed the risks of CMO's, including credit, coupon and price risks.[9] The memorandum acknowledged the existence of some coupon and price risks. Finally, the Approval Memorandum stated that both the price of the bond and the interest rates are guaranteed by the federal government, unless the holder sells before maturity, in which case the market price will prevail.

Although defendants made the aforementioned disclosures, on certain occasions Epley downplayed the risks and strongly encouraged the Bank to purchase additional CMO's. When Bank officials asked Epley about the "Pinocchio" article, for example, Epley replied with a letter contending that the article applied largely to individual, rather than institutional, investors, and touting MMAR's expertise in the CMO market.[10]

The record contains no indication that, at any time, the Bank requested, but did not receive, additional information from Epley or Alex. Brown as to the nature of the investments at issue in this case. For example, although more detailed information apparently was available as to both the likely yield of

---

**3.** MMAR Group Guide at 16.

**4.** MMAR Group Guide at 17.

**5.** MMAR Guide to Inverse IO's at IE 000142.

**6.** The Bank neither requested nor received from defendants any prospectus discussing any of the particular securities which the Bank purchased.

**7.** Letter from Epley to Buentello of 7/22/92 at 1.

**8.** According to Jose Luis Mendez, one of the Bank's employees, that article was sent to the Bank by Prudential Securities, which had over $100 million invested in Banca Cremi CDS, out of concerns for the Bank's solvency in light of its investments in CMO's. Mendez Dep. at 98–100.

**9.** Mot. for Summ.J. at Ex. 17.

**10.** Letter from Epley to Buentello and Mendez of 1/21/93.

the CMO's purchased by the Bank and the potential price volatility of those securities, the Bank apparently did not request such information.

### E. The Bank's CMO Purchases

On August 11, 1992, the Bank made its first CMO purchase. Over the next nineteen months, the Bank purchased twenty-nine different CMO securities on thirty-three occasions, mostly through Alex. Brown. Between August, 1992, and December, 1993, CMO investments earned the Bank a profit of approximately $2 million. Of the thirty-three purchases, twenty-four were sold within 180 days.

In early 1994, the U.S. Federal Reserve Board surprised many investors by increasing short-term interest rates to curtail the onset of inflation. That action, combined with other factors, caused a sharp decrease in both the price and liquidity of fixed-rate securities—including CMO's. With far more investors who were seeking to sell than were seeking to buy, the value of the entire CMO market dropped dramatically.

By the early part of 1994, when the CMO market began to falter, the Bank held approximately $40 million worth of CMO securities, including the following six bonds, which are the subject of this litigation:

a. FN 93–169C, FN 93–203 SA, FN 93–210 SD, inverse floaters, purchased in September and October, 1993, through Alex. Brown at a total cost of approximately $24 million.

b. Freddie Mac 1676 S, an inverse floater, purchased on January 24, 1994, for approximately $4.6 million. Although the Bank purchased the security from another firm, Southwest Securities, defendants were intimately involved in the transaction, having arranged the deal, purchased the security earlier in the day, and sold it to Southwest at a

profit before Southwest sold the security to the Bank.

c. Fannie Mae 94–29 SD, an inverse floater, purchased through Alex. Brown on February 2, 1994, for approximately $4.9 million. The Bank purchased this security from Alex Brown after the Bank had first discussed a slightly different security with another brokerage firm, PaineWebber.

d. FHR 1711, an inverse IO, purchased through Alex. Brown on March 30, 1994, for approximately $6.1 million.

## II

### Summary Judgment

According to the Federal Rules of Civil Procedure, summary judgment is appropriate when "there is no genuine issue as to any material fact and [when] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The procedural device of summary judgment has existed for a significant period; however, it has not always been extensively granted. In fact, prior to 1986, courts were often reluctant to resolve cases by the use of summary judgment.[11] That reluctance was especially evident in cases involving complex litigation, such as securities and antitrust matters. See, e.g., Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962) ("[w]e believe that summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles").

During the pre–1986 period, the Court of Appeals for the Fourth Circuit followed that approach in a number of cases. For example, in Pierce v. Ford Motor Co., 190 F.2d 910 (4th Cir.), cert. denied, 342 U.S. 887, 72 S.Ct. 178, 96 L.Ed. 666 (1951) that court overturned the entry of summary judgment, ruling that "ordinarily" summary judgment should be denied even if the court were convinced that the plaintiff's case would not

---

11. See Samuel Issacharoff and George Loewenstein, Second Thoughts About Summary Judgment, 100 Yale L.J. 73, 77 (1990) (hereinafter "Second Thoughts") ("From its inception, federal judges treated summary judgment warily, perceiving it as threatening a denial of such fundamental guarantees as the right to confront witnesses, the right of the jury to make inferences and determinations of credibility, and the right to have one's cause advocated by counsel before a jury.")

survive a motion for directed verdict at trial. *Id.* at 915.

"It is only where it is perfectly clear that there are no issues in the case that a summary judgment is proper. Even in cases where the judge is of opinion that he will have to direct a verdict for one party or the other on the issues that have been raised, he should ordinarily hear the evidence and direct the verdict rather than attempt to try the case in advance on a motion for summary judgment, which was never intended to enable parties to evade jury trials or have the judge weigh evidence in advance of its being presented."

*Pierce,* 190 F.2d at 915; *see Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985) ("even where a directed verdict would be proper after hearing the evidence, the district court should not try the case in advance by summary judgment").

In 1986, however, the United States Supreme Court decided three cases which enhanced the use of summary judgment. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (collectively, the "Trilogy") together constitute what has been called a "new era" for summary judgment.[12] The Trilogy represents a move by the Supreme Court toward greater utilization of the summary judgment procedural device, even in complex cases. Since defendants file the majority of summary judgment motions, the Trilogy approach often favors defendants. According to observers, "[f]rom the defendant's vantage point ... the effect of the trilogy is both to facilitate the process for making a summary judgment motion and to increase the likelihood of success of such a motion."[13] That effect is indicated in a recent study which evaluated antitrust conspiracy decisions in the wake of *Matsushita* and noted that defendants were far more likely to prevail on summary judgment motions than previously.[14]

In *Celotex,* Justice Rehnquist, writing for a majority of the Supreme Court, concluded that summary judgment must be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552. *Celotex* has been interpreted as "reorder[ing] the burdens facing each party at the summary judgment stage to mirror the ultimate burdens that each party would bear at trial, thereby greatly reducing the demands made upon defendant-movants."[15] In *Celotex,* Justice Rehnquist observed that "Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis." *Celotex,* 477 U.S. at 327, 106 S.Ct. at 2555.

In *Anderson,* Justice White, for the majority, elaborated upon the requirement that in order to grant summary judgment, there must not be a genuine issue of material fact. To determine if disputed facts are material, *Anderson* teaches that courts are to look to the substantive law of the underlying case for disputes which "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. If there is such a dispute, and if it is such that would permit a reasonable jury, assessing the evidence, to return a verdict for the non-moving party, summary judgment will be denied. In identifying genuine disputes

---

**12.** *See* Steven Alan Childress, *A New Era for Summary Judgments: Recent Shifts at the Supreme Court,* 116 F.R.D. 183 (1987).

**13.** *Second Thoughts* at 93.

**14.** That study revealed that summary judgment was entered in favor of defendants in 64 cases, denied in 13 cases, with no cases granting summary judgment on behalf of plaintiffs. *See Second Thoughts* at 92 n. 106 (citation omitted).

**15.** *Second Thoughts* at 84.

of material fact, the non-moving party is entitled to any reasonable inferences to be drawn from the underlying facts. *See Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1129 (4th Cir.1987). However, the non-movant cannot rest on evidence that is "merely colorable" or a mere "scintilla," in order to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 249–50, 252, 106 S.Ct. at 2511, 2512.

In one of the Trilogy, namely, *Matsushita*, summary judgment was granted in an antitrust case, signaling a significant shift away from the Court's earlier hesitation to grant summary judgment in complex cases. In *Matsushita*, Justice Powell, for the majority, noted that a non-movant opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356. Thus, the non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. Thus, if the non-moving party does not do so, and if the record as a whole fails to indicate such an issue, summary judgment is appropriate.

An important impact of the Trilogy is the growing willingness of courts, in appropriate circumstances, to consider in the context of summary judgment, issues such as scienter and materiality, previously often thought to raise factual issues not susceptible to summary judgment motions. *See In Re Apple Computer Securities Litig.*, 886 F.2d 1109, 1113 (9th Cir.1989) (noting that while "[m]ateriality and scienter are both fact-specific issues which should ordinarily be left to the trier of fact ... summary judgment may be granted in appropriate cases.") (citations omitted). The Fourth Circuit has fully recognized that trend. In *Cooke v. Manufactured Homes, Inc.*, 998 F.2d 1256 (4th Cir. 1993), the Court noted that "[w]hile securities claims are often fact-specific and properly resolved by a jury, 'summary judgment may be granted in appropriate cases.'" *Id.*

at 1262 (quoting *In re Apple, supra*). In Judge Wilkins' words, used by him in the course of affirming in part and reversing in part the district court's grant of summary judgment, the trial court, of course, must draw "the most favorable inferences that may reasonably be drawn [in support of the non-movant] from the forecasted evidence," but genuine issues of material fact cannot be created "through mere speculation or the building of one inference upon another." *Id.* at 1260 (citations omitted). "The essence of the [summary judgment] inquiry [is] ... 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Id.* (quoting *Anderson v. Liberty Lobby, supra* at 251–52, 106 S.Ct. at 2512.)

The Fourth Circuit has carefully scrutinized claims of securities fraud brought by disappointed investors who have suffered losses in their investment strategies. *See Gasner v. Bd. of Supervisors*, 103 F.3d 351 (4th Cir.1996) (affirming summary judgment for defendants); *Hillson Partners Ltd. Partnership v. Adage, Inc.*, 42 F.3d 204 (4th Cir.1994) (affirming dismissal), *Raab v. General Physics Corp.*, 4 F.3d 286 (4th Cir.1993) (affirming dismissal). In *Raab*, for example, Judge Wilkinson pointed out that "[t]he market has risks; the securities laws do not serve as investment insurance. Every prediction of success that fails to materialize cannot create on that account an action for securities fraud." *Id.* at 291.

In the light of the Trilogy and Fourth Circuit precedent, this Court will carefully evaluate all of the Bank's assertions in this case of disputed issues of alleged material fact, before determining whether summary judgment is or is not appropriate based on the proffered evidence in the record and upon any inferences which may reasonably be drawn in the Bank's favor from the proffered evidence.

## III

### *Plaintiffs' Claims Under § 10(b)*

Section 10(b) prohibits the use of any manipulative or deceptive device or contrivance

in connection with the purchase or sale of any security. 15 U.S.C.A. § 78j(b). Rule 10b–5 further provides that it is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading … in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5 (1992). Plaintiffs appear to be proceeding under two § 10(b) theories: (1) fraud and (2) unsuitability of the investments. As will be discussed *infra,* the elements of those two claims are not dissimilar.

## A. Fraud

To establish liability under Section 10(b), a plaintiff must prove several elements: "(1) the defendant made a false statement or omission of material fact (2) with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's damages." *Cooke v. Manufactured Homes, Inc.,* 998 F.2d at 1260–61 (4th Cir.1993) (other citations omitted). A plaintiff cannot recover if that plaintiff failed to exercise reasonable diligence to understand the nature of the investment. *See Thompson v. Smith Barney, Harris Upham & Co.,* 709 F.2d 1413, 1418 (11th Cir.1983); *Dupuy v. Dupuy,* 551 F.2d 1005, 1014 (5th Cir.), *cert. denied,* 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977).[16] This Opinion will attempt to discuss each element individually, however, there is a certain degree of overlap.

### 1. False Statement or Omission of Material Fact

■ Plaintiffs herein allege that defendants misled them with regard both to the risks of CMO investments in general and to the risks associated with the particular securities purchased. However, the record indicates that defendants disclosed certain risks of investing in CMO's—namely, coupon, price and liquidity risks.

The disclosures made by Epley and Alex Brown were most clear with regard to the coupon (or yield) risk of CMO's in general. As noted *supra,* defendants provided, among other items, a pamphlet stating that inverse floaters "have the potential for significant yield volatility." [17] The July 22, 1992 letter from Epley to Buentello also acknowledged coupon risk. Finally, with each proposal they made, defendants typically provided yield matrices which demonstrated the potential impact of changes in interest rates on the yield of the security. Although plaintiffs contend that those tables were insufficient to make an informed investment decision—and that Alex. Brown and Epley could have made available more sophisticated information regarding potential yield—the Bank makes no allegation of any particular misstatement with regard to yield volatility. Furthermore, if the yield tables were inadequate, the Bank could easily have requested more detailed information from defendants.

With respect to price volatility, defendants did disclose the risk that the price of the CMO's could drop. For inverse IO's, the MMAR Group Guide noted that "[p]rices of inverse IO's can be extremely volatile." [18] As for inverse floaters, defendants' disclosures included the July 22, 1992 letter to Buentello which stated that, "as with all fixed income securities, as interest rates rise and fall there is an inverse relationship as to price." [19] The Approval Memorandum, prepared with Epley's assistance, also acknowledged that risk, stating that "[l]ike all fixed rate securities there is an inverse relationship between interest rates and bond

---

16. The Second Circuit has not established due diligence as a separate element of a 10(b) action but instead, apparently, has connected diligence to reliance. *Royal American Managers, Inc., v. IRC Holding Corp.,* 885 F.2d 1011, 1015–16 (2d Cir.1989). The Fourth Circuit does not appear precisely to have considered the question of how the requirement of due diligence fits into the analytical scheme. But in any event, the case law is clear that a plaintiff must show that it exercised reasonable diligence in order to recover in a 10(b) action.

17. MMAR Group Guide at 16.

18. MMAR Group Guide at 17.

19. Letter from Epley to Buentello of 7/22/92 at 1.

price." [20]

The Bank, along with its expert, James Midanek,[21] disputes the value of such general disclosures, claiming that they fail to identify the greater price sensitivity of inverse floaters in comparison to some other fixed income securities.[22] Defendants' expert, Michael Ferri, agrees that such statements alone do not specifically divulge the degree of price sensitivity of inverse floaters.[23] But even if those general disclosures were insufficient, the record contains other information which discloses the price sensitivity of the CMO's to changing interest rates. For example, in July 1993, prior to the Bank's purchase of any of the six securities primarily at issue herein, defendants provided the Bank with information about the price sensitivity of other inverse floaters and IO's vis-a-vis possible interest rate fluctuations.[24] That analysis indicated that a half percent (.5%) increase in the interest rate could cause the price of an inverse IO to drop 15.33% and that the same increase could cause a 3.75% drop in the price of an inverse floater. Given its investment experience, the Bank could and should have been able to infer from that data that a 1% rise in interest rates could cause an approximately 30% drop in price of the inverse IO as well as a 7% drop in the price of the inverse floater.

The Bank contends that in addition to the information discussed above, the defendants had the ability to run and did, on at least one occasion, run other analyses which showed the magnitude of the price volatility risks inherent in the securities, yet failed to provide those results to the Bank.[25] There may also have been other analytical tools such as effective duration analysis or option adjusted spreads which could and would have indicated specific potential price changes. However, in the context of complex investments such as CMO-derivatives, a disappointed investor—particularly if such investor is as experienced as the Bank—looking backward through a 20–20 lens, can always point to more information, which, in hindsight, the investor believes would have better advised him or her of the potential risks. At most, Midanek's contentions suggest that defendants, in their disclosures, somewhat downplayed the risk of potential price volatility in the inverse floaters market. Midanek points to no affirmative misstatement in that regard, only to possible omissions.[26]

Defendants' disclosures were perhaps weakest with regard to liquidity risk. The sample prospectus provided to the Bank alluded to liquidity risk using only boilerplate language. In addition, the Bank points to Epley's July 22, 1992 letter to Buentello which acknowledged the existence of liquidity risk, but downplayed it: "The problem now is lack of product. The demand currently far exceeds supply." [27] Midanek, in his expert report, contends that "[t]his is false, demand for inverse floaters never outstripped supply." [28] However, Midanek's statement, without more, is not sufficiently specific to create a disputed question of significant, material fact. Moreover, even if a reasonable jury could conclude that defendants conveyed

---

**20.** Approval Memorandum at BC001981. That document appears to be referring only to inverse floaters.

**21.** The Court notes that Defendants object to the use of Midanek's testimony and report. *See* Defs' Mot. to Strike Test. and Report of James I. Midanek. However, taking the proffered evidence in the light most favorable to the non-moving party, as is usually proper in a summary judgment context, this Court has considered Midanek's views despite Defendants' objections.

**22.** Midanek Report at 17–18.

**23.** Ferri Dep. at 290–91.

**24.** *See* Mot. to Strike Pls.' Supp.Memo. Re: Expert Test., Ex. B at BC002566.

**25.** Pls.' Post–Hearing Brief at 6.

**26.** The Bank also seems to be suggesting that defendants did not disclose the risk to the *capital* of the Bank. Capital risk would seem to be largely indistinguishable from price risk; if the Bank buys at $100 and then sells at $50, it has lost some of its capital. The Bank notes—and defendants revealed—that the U.S. government guarantees both the price of the bond and the interest rates, unless the holder sells before maturity. Obviously, if an investor decides to sell *before* maturity, as did the Bank, it receives the price it obtains on the market.

**27.** Letter from Epley to Buentello of 7/22/92 at 2.

**28.** Midanek Rep. at 18.

the thought to the Bank that liquidity risks were minimal, the Bank has shown nothing to indicate that either Epley or Alex. Brown knew any such statement to be false at the time Epley made it.

Indeed, the record of the Bank's CMO trades from August, 1992 to the beginning of 1994, indicate that, during that period, the liquidity risks to the Bank, if any, were minimal. Rather, the Bank was able to sell the CMO's which it owned with little if any delay. It apparently was not until the market collapse in early 1994 that liquidity became a substantial problem. In light of the absence of liquidity problems for the Bank in the pre-collapse period, this Court does not need further to explore the Bank's assertion that the market was illiquid during that period.[29] Moreover, there is nothing in the record which indicates that defendants anticipated (or even should have anticipated), at least to a greater extent than the seeming majority of other investors and of the market itself, the dramatic decrease in liquidity which occurred in early 1994.[30] While Midanek takes the position that the increase in interest rates which occurred in late 1993 and 1994 was comparable to increases in interest rates over different periods during the past two decades, the collapse of the CMO market in early 1994, which was attributed, at least in part, to rising interest rates, apparently took many investors by surprise.

As for the particular securities purchased by the Bank, five of the six CMO's at issue were inverse floaters. Plaintiffs have presented nothing to show that any of those five inverse floaters carried any particular risk, aside from the risks associated with inverse floaters in general. Those general risks have been discussed *supra*. Although, as plain-

tiffs note, each inverse floater is different and carries with it different risks, plaintiffs have shown nothing to indicate that any of those particular risks posed substantial problems for the Bank. The sixth security purchased by the Bank, FHR 1711, was an inverse IO and is separately discussed, *infra*, in the section of this Opinion relating to scienter.

It is correct, as the Bank points out, that materiality of information is generally not resolved on summary judgment. *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 450, 96 S.Ct. 2126, 2132–33, 48 L.Ed.2d 757 (1976); *Cooke*, 998 F.2d at 1262 (4th Cir.1993). However, summary judgment can be awarded in this case, without being so barred, because even assuming that there were one or more misstatements or omissions, and that said misstatements or omissions were material, the Bank would still have to prove the other elements of a § 10(b) action, including its own justifiable reliance and due diligence, which the record in this case discloses that the Bank has not done.

### 2. Scienter

Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Malone v. Microdyne Corp.*, 26 F.3d 471, 478 (4th Cir.1994) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976)).[31] As noted above, while scienter has traditionally been difficult to resolve on summary judgment, it may be granted in appropriate cases. *See, e.g., In Re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989). In *Mayer v. Oil Field Systems Corp.*, 803 F.2d 749 (2d Cir.1986), the Second Circuit affirmed the entry of summary judgment

---

**29.** This case is therefore distinguishable from *TCW/DW North American Gov't Income Trust Sec. Litig.*, Fed.Sec.L.Rep. (CCH) ¶ 99,320 (S.D.N.Y. Aug. 28, 1996), in which Judge Leisure, in a securities class action comprised of individual, non-institutional investors, stated that "[t]he Court does not consider failure to disclose adequately the allegedly inherent illiquidity of the CMO to be immaterial as a matter of law." *Id.* at 95,931.

**30.** Indeed, the Bank's own documents reflect the fact that the liquidity problems were unanticipated. "Since 1988 when the CMO market be-

gan, no lack of liquidity situation had ever arisen in the CMO market nor in the fixed rate market in general." Defs.' Mot. for Summ.J. at Ex. 2A at 000571 (Conclusions from Meeting Held at Banca Cremi, Reforma 93–9 on October 24, 1994.)

**31.** As Judge Murnaghan noted in *Malone*, a number of circuits have concluded that recklessness can satisfy the scienter requirement, at least in some circumstances. *Malone*, 26 F.3d at 479 n. 9. In any event, in this case, plaintiffs have not shown such recklessness.

in a securities case involving Section 10(b), noting that proof of "[s]cienter requires at least knowing misconduct, which may, of course, be proven as a matter of inference from circumstantial evidence." *Id.* at 756 (citation omitted). However, the court continued: "[s]ummary judgment is appropriate when the nonmoving party has come forward with no evidence from which a reasonable fact finder could find that the defendant had the requisite state of mind." *id.; see also Krim v. BancTexas Group, Inc.,* 989 F.2d 1435, 1449–50 (5th Cir.1993) (Goldberg, J.) (affirming grant of summary judgment where plaintiff failed to produce evidence creating a genuine issue of material fact as to scienter).

■ The Bank has proffered little, if any, evidence to indicate that the defendants made the alleged misrepresentations or omissions in connection with the five inverse floater purchases at issue, with scienter. However, the Bank is apparently attempting to show scienter via an inference that the defendants charged excessive markups, which is discussed *infra.*

In the case of the sixth security purchased by the Bank, FHR 1711, an inverse IO, in this Court's view, the Bank has failed to proffer any evidence of scienter. When the inverse floater market began to sour in early 1994, defendants sent the Bank a strategy letter, discussing three possible courses of action for the Bank to take in order to improve its position.[32] One of those strategies—and the one recommended by defendants—was to maintain the Bank's existing portfolio and purchase another security to "hedge" against a further increase in interest rates. Defendants suggested three potential types of hedging securities—"PAC IO's," "trust IO's" and "low leverage Inverse IO's." [33] The Bank followed that advice and, through Alex. Brown, purchased approximately $6.1 million worth of FHR 1711, an inverse IO, on March 30, 1994.

As noted *supra,* the MMAR Group Guide disclosed that "prices of inverse IO's can be extremely volatile." [34] Moreover, Buentello has testified that "we understood [inverse IO's] to be very risky." [35] Plaintiffs' expert Midanek, however, contends that FHR 1711 "should not have been expected to act as a hedge" against rising interest rates and that "[b]ecause of their very structure, Inverse IO's generally do not increase in value in a rising interest rate environment." [36] Plaintiffs also argue that Epley and Alex. Brown mischaracterized the qualities of inverse IO's in order to obtain a high markup on their sale.

Even if Midanek is correct about the characteristics of an inverse IO, plaintiffs have failed to show that defendants acted with scienter in connection with the Bank's purchase of this inverse IO. Defendants did not present inverse IO's as a guaranteed hedge against rising interest rates; in their strategy letter they state that trust IO's "offer the most effective hedge." [37] The undisputed proffered evidence indicates that defendants disclosed, and plaintiffs knew, that inverse IO's were a very risky investment and were not the best available hedge against rising interest rates, but that the Bank chose to invest in them nonetheless. Moreover, plaintiffs themselves note that the markup on trust IO's, which defendants presented as the most effective hedge against rising interest rates, likely would have been a mere fraction of the markup on inverse IO's.[38] The Bank chose to invest in inverse IO's, thus providing defendants with a larger markup than they would have earned had the Bank chosen to purchase trust IO's. Accordingly, the Bank's assertion that defendants recommended inverse IO's in order to gain a large markup is therefore speculative at best and is belied by the facts of the case. At most, plaintiffs have proffered evidence that Alex. Brown and Epley gave questionable investment advice, not that they intended to mislead the Bank.

---

**32.** Letter from Epley to Buentello of 3/2/94.

**33.** *Id.*

**34.** *MMAR Group Guide* at 17.

**35.** Buentello Dep. at 223.

**36.** Midanek Report at 24.

**37.** Letter from Epley to Buentello of 3/4/94 at 2.

**38.** *See* Pls.' Post–Hearing Brief at 20.

### 3. Justifiable Reliance

The third element of a Section 10(b) claim is justifiable reliance, which is often linked with a requirement of due diligence by the plaintiff. *See Dupuy v. Dupuy,* 551 F.2d 1005, 1014 (5th Cir.1977). Courts have precluded recovery by plaintiffs who failed to exercise reasonable diligence to understand the nature of their investments. *See Thompson v. Smith Barney, Harris Upham & Co., Inc.,* 709 F.2d 1413, 1418 (11th Cir.1983); *see also Platsis v. E.F. Hutton & Co., Inc.,* 946 F.2d 38, 41 (6th Cir.1991) (taking into account the level of sophistication of the investor in determining whether disclosure was adequate and whether the investor relied upon it), *cert. denied,* 503 U.S. 984, 112 S.Ct. 1669, 118 L.Ed.2d 389 (1992).[39] Therefore, in order to survive summary judgment, the Bank must demonstrate that it exercised due diligence and justifiably relied on the defendants' alleged misrepresentations and omissions.

This case involves allegations of both misrepresentations and omissions of material fact. Where there is fraud by misrepresentation, the case law requires the plaintiff to establish justifiable reliance. *See Myers v. Finkle,* 950 F.2d 165 (4th Cir.1991). On the other hand, where the alleged fraud is in the nature of a failure to disclose information that a reasonable investor would consider significant, the test is somewhat different: "it may be inferred that the customer would have relied ... in the case of non-disclosure ... on the information had he known it." *Carras v. Burns,* 516 F.2d 251, 257 (4th Cir.1975) (citing *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972)). Such an inference is rebuttable, as Judge Butzner further made clear in *Carras:* "The broker, however, may rebut these inferences by proving lack of reliance and, consequently, a lack of causation." *Carras* at 257 (citation omitted). Moreover, in this Court's view, following *Carras* and giving the plaintiff the benefit of an inference of reliance does not eliminate the requirement that the plaintiff exercise due diligence prior to justifiably relying on the defendants' silence.

In the instant case, the plaintiff is neither an individual investor nor a class comprised of individual investors, as is so in most reported cases alleging § 10(b) fraud. *See, e.g., Myers v. Finkle,* 950 F.2d 165 (4th Cir.1991). There appears to be little, if any, specific case law involving plaintiffs like the Bank. The distinction between an individual investor (or class of such) and an institutional investor would appear somewhat significant in determining whether the plaintiff has established the element of justifiable reliance, and its due diligence component. In cases involving individual investors alleging securities fraud, courts apply a multi-factor test to determine justifiable reliance. *See Myers,* 950 F.2d at 167 (4th Cir.1991); *Zobrist v. Coal–X, Inc.,* 708 F.2d 1511, 1515–17 (10th Cir.1983). The factors include:

(1) the sophistication and expertise of the plaintiff in financial and securities matters;

(2) the existence of long standing business or personal relationships;

(3) access to relevant information;

(4) the existence of a fiduciary relationship;

(5) concealment of the fraud;

(6) the opportunity to detect the fraud;

(7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and

(8) the generality or specificity of the misrepresentations.

*Myers,* 950 F.2d at 167. When those factors are applied to the individual investor, all relevant factors must be considered to determine if reliance is justified—no "single factor" is dispositive. *Id.; Zobrist,* 708 F.2d at 1517. However, when the plaintiff is a large financial institution such as the Bank, the first factor, the sophistication and expertise of the plaintiff in financial and securities matters, is highly significant, and sometimes dispositive. *See J.H. Cohn & Co. v. Am. Appraisal Assoc., Inc.,* 628 F.2d 994, 998 (7th Cir.1980) ("The Evergreen Fund is a sophisticated investor very familiar with financial statements. Such an investor may not be as justified in relying on any material misrepre-

---

**39.** *See supra* note 16.

sentations or omissions of material facts as other purchasers of ... [the] stock.")

The Fourth Circuit apparently has not addressed the issues of whether institutional investors are, as a matter of law, sophisticated, or how a finding of sophistication in connection with an institutional investor impacts the justifiable reliance and due diligence inquiries. Some commentators argue that there should be a presumption of sophistication in cases involving institutional investors.[40] However, in the within case, this Court will evaluate the Bank's sophistication before determining the defendants' liability, if any.[41] Defendants argue that the Bank was a sophisticated investor. In contrast, the Bank argues that it was unsophisticated, at least with respect to CMO investing. In plaintiffs' view, the very existence of that dispute precludes summary judgment. However, in light of the Trilogy decisions' requirement that a non-movant "do more than simply show that there is some metaphysical doubt as to the material facts," an analysis of the Bank's sophistication is both appropriate and necessary at this stage. *See Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356.

Evaluating investor sophistication leads necessarily to both subjective and objective inquiries which assess the characteristics of the plaintiff. Factors which courts sometimes analyze in determining sophistication include: wealth, age, education, professional status, investment experience and business background. Some or all of those factors, which are important in the context of the individual investor, *Myers,* 950 F.2d at 168,

can apply to an institutional investor. In this case the Bank had been long in business; was possessed of more than minimum capital; and those Bank employees who were involved in this matter collectively possessed considerable experience and background in investing. Also relevant to consideration of the Bank's sophistication is its prior investment activities and its effort to understand the CMO investments.[42]

By any standard, Banca Cremi is a substantial financial institution. During the period in question, the Bank had assets of approximately $5 billion and its annual operating income exceeded $36 million. In addition, the three individuals who were the Bank's main participants in the trades in question with Alex Brown, each had substantial experience in investments which were sensitive to interest and exchange rates. Armando Aguirre, Director of Banca Cremi's International Division, holds a degree in economics. Before joining Banca Cremi in 1981, Aguirre held a variety of positions in which his responsibilities included currency investments and the development of accounting systems. He also served as a part-time economics teacher. He joined Banca Cremi as a manager in its Foreign Exchange Department, and over the next several years he received a number of promotions. In 1985 he became Subdirector of Banca Cremi's New International Negotiations ("NNI") unit and in 1989 Director of its International Division. Jose Luis Mendez, Director of NNI, also holds a degree in economics. His responsibilities at the Bank have included

**40.** *See* C. Edward Fletcher III, *Sophisticated Investors Under the Federal Securities Laws,* 1988 DUKE L.J. 1081, 1153 (taking the position that "[s]uch a presumption should exist, and it should be a conclusive presumption").

**41.** Plaintiffs' reference to Judge Williams' unreported Memorandum and Order in *In Re Olympia Brewing Co. Sec. Litig.* in which she observed that "[t]he sophistication of the investor is immaterial when it comes to plaintiffs' claims based upon misrepresentations and omissions" and "[t]hus, whether or not plaintiffs were sophisticated investors has no bearing on whether or not they can sustain a cause of action under the applicable federal securities laws," is noted. 1985 WL 3928, *9 (N.D.Ill. Nov. 13, 1985). However, given the number of reported cases

which do consider the sophistication of the investor to be material, this Court will not follow Judge Williams's approach in that case. *See, e.g., Myers,* 950 F.2d at 167 (4th Cir.1991) ("The first factor regarding justifiable reliance involves a consideration of the sophistication of the [plaintiffs] and their experience in financial and investment matters.")

**42.** *See Thompson v. Smith Barney, Harris Upham & Co., Inc.,* 709 F.2d at 1418 (11th Cir.1983) (Fay, J.) ("[plaintiff] did not inquire about any of the transactions he now complains were incomprehensible to him ... [nor did he] question[ ] the extraordinary profits he was making off his investments, even though the securities that were purchased yielded returns inconsistent with conservative investment objectives").

tracking U.S. interest rates and advising the Bank's Cayman Island branch on U.S. dollar denominated investment options. Monica Buentello, Assistant Director of NNI, holds a degree in international relations. While working at the Bank, she completed several post-graduate courses of study in international commerce and analysis. In 1993, she participated in at least two seminars on the subject of investing in derivatives and CMO's. The Bank now argues that Buentello's youth and inexperience raise questions as to the Bank's sophistication with respect to CMO's; however, while Buentello was defendants' principal contact at the Bank, she was not, as discussed, *infra*, acting without supervision.

From 1992 to 1994, those three individuals, subject to the oversight of the Bank's Director of Finance and Treasurer, were responsible for hundreds of millions of dollars of international investments and other transactions.[43] The Bank, through its employees, therefore, had extensive experience in securities which were sensitive to interest and exchange rates. Although the Bank claims it

was a novice in the CMO field, Buentello and Mendez each had attended seminars on the secondary mortgage markets. They could be expected to know, for example, that a multiplier would affect a particular inverse floater's sensitivity to interest rates. Perhaps most fundamentally, the complexity and uncertainty of certain types of derivatives were well-known in the investment community.

Plaintiff's assert that the Bank's experience in some types of investments does not translate into experience in CMO investing. In *McAnally v. Gildersleeve*, 16 F.3d 1493 (8th Cir.1994), Judge Magill, for the majority, concluded that individual plaintiffs who "had significant experience and success with stocks and bonds" presented "sufficient evidence for a reasonable jury to have concluded that plaintiffs were not sophisticated with respect to commodity futures options." *Id.* at 1500. Judge Lay, disagreeing, dissented. *Id.* at 1501. Here, the plaintiffs point to a few statements which, they claim, indicate lack of comprehension by the Bank of basic principles of CMO investing.[44] Still, even if

[43] In November, 1992, for example, the NNI unit issued $50 million in fixed-rate Eurobonds, and in July 1993, it issued another $150 million in fixed-rate Eurobonds. Shortly thereafter, the unit engaged in at least two complex "interest rate swaps" in which the Bank traded the obligation to pay interest on certain of the Eurobonds for an obligation to pay interest on an equivalent principal amount which was tied to the U.S. variable short-term rate. One such swap involved at least $160 million. Arguably, at least those "swaps" could be considered derivatives.

[44] The Bank points to several items as indicia of its unsophistication:

Two of the items relate to the Approval Memorandum which Epley helped Buentello draft. First, the Bank points to an erroneous statement in the Approval Memorandum "This operation is the same as selling an option (cap) to the floater to hedge against rise in reference rates (LIBOR), and receive an extraordinary return coming from leverage." Instead of "cap" it should say "floor." Second, the Bank argues that the Approval Memorandum refers to inverse floaters as being a highly liquid market and having low risk levels. However, the Approval Memorandum actually says that the market for inverse floaters was growing and becoming increasingly liquid, not that it was highly liquid. As for the risk level, the Approval Memorandum says that inverse floaters have "relatively low risk levels."

The Bank also contends that it was unsophisticated because one of its employees, Buentello, allegedly viewed the price volatility and quality of CMO's as akin to that of treasury bills. However, even if Buentello oversimplified the similarities between treasury bills and CMO's, the Bank's decision-makers cannot rely, on what they seemingly desire to label as her ignorance, to protect them—she was hardly ignorant.

The Bank also argued that the amount it invested (allegedly more than 100% of its operating income and over 15% of its net worth) raises a strong inference that it failed to comprehend the true nature and risks of CMO's. (In conjunction with that claim, the Bank makes the point that such levels of investment would be impermissible in a bank subject to U.S. government regulations. However, that position is not controlling since Banca Cremi is not subject to U.S. regulations; nevertheless, the contention is taken into account herein.) Finally, the Bank alleges that it had never dealt with CMO's or considered investing in CMO's before being approached by Epley, and that it never purchased any security similar to inverse floaters. Taking that contention that the Bank did not buy or own any security similar to an inverse floater as true, this Court notes that prior to the market collapse, the Bank traded successfully in CMO derivatives, including inverse floaters, for over a year.

While those points may perhaps demonstrate that one or more of the employees of the Bank

those statements are viewed as evidence of unsophistication, they must be evaluated in the light of the overall circumstances, as discussed below.

The defendants assert that the Bank began considering an investment in CMO's as early as the spring of 1992.[45] However, according to Buentello, the Bank had not considered CMO investments until Epley approached her superior, Aguirre, in June 1992.[46] For purposes of summary judgment the Court will accept the Bank's said version and assume that the Bank began considering CMO investments in June 1992. After that initial contact, and prior to beginning to trade, members of the NNI Group, to some extent assisted by Epley, drafted the Approval Memorandum, discussed it with the Bank's Director of Finance (Garcia) and its Treasurer (Pacheco), and ultimately sought and obtained authority to trade in CMO securities. Upon receiving that approval, on August 11, 1992 the Bank purchased its first CMO for approximately $5.4 million. Over the ensuing eighteen months, the Bank purchased a total of 29 CMO's, including the six at issue in this case, from the Defendants.[47] For over a year, the Bank's CMO trades were profitable—earning the Bank over $2 million.[48]

During the period in which it traded in CMO's, the Bank had procedures in place to govern the purchase and sale of CMO's. Those procedures were ultimately formalized in a manual entitled "Policy and Procedures Manual for Purchase and Sale of Mortgage Bonds" ("Procedures Manual").[49] To purchase a CMO derivative, the Procedures Manual outlines a fourteen step process of which step three requires that the Bank perform an Investment Risk Analysis taking into account several factors.[50] In addition, the Procedures Manual makes it clear that each such transaction must be authorized by a superior.[51] The deposition testimony of Buentello, Aguirre and Mendez indicates that Buentello did obtain Aguirre's approval prior to conducting each purchase or sale of CMO's.[52] The record also indicates that, on at least some occasions, the Bank chose not to invest in Epley's proposals for CMO investment.[53]

Thus, this was not a situation in which the Bank simply turned over its investment decisions to the defendants. Rather, the record shows that the Bank was an experienced, institutional investor which made its own individual investment decisions based on both information received from its brokers and its own business judgment. In *M & B Contracting Corp. v. Dale*, 795 F.2d 531 (6th Cir.1986), Chief Judge Lively rejected a Vice President of Finance's "protestations of ignorance about the market and his total reliance upon [the broker's] recommendations ...

---

was somewhat inexperienced or unsophisticated, they are not, either individually or taken together, substantial enough to override the failure of the Bank, as an institution, in view of its history and up-to-date activities, to exercise due diligence before investing.

**45.** An internal Bank report dated April 22, 1992, which Buentello testified that she read, summarized the primary and secondary U.S. mortgage markets, including CMO's. That same month, Mendez attended a two-day seminar on the secondary mortgage market.

**46.** Buentello Aff. at ¶¶ 4–5.

**47.** Although Defendants point out that one or two trades may have been done through other firms, viewing the record in the light most favorable to the Bank, during this period, defendants appear to have been involved in either the purchase or sale of virtually every CMO security done by the Bank.

**48.** *See* Defs.' Mot. for Summ.J. at Ex. 2A, at 000570, ¶ 2.

**49.** While the Procedures Manual was developed after the Bank began trading in CMO's, according to Mendez, the procedures it sets forth were informally in effect from the beginning of such activity. Mendez Dep. at 109.

**50.** Those factors include: macro indicators in U.S.A., the type of bond and coupon, the prepayment rate and the "main variables: treasury bills, LIBOR yield curve." Procedures Manual at BC 002302.

**51.** *See* Defs.' Mot. for Summ.J. at Ex 33 (Procedures Manual) at BC 002303 ("No transaction may be made without authorization ... [of the] Director or Assistant Executive Director.")

**52.** Buentello Dep. at 46; Aguirre Dep. at 38; Mendez Dep. at 49.

**53.** Mendez Dep. at 50; Buentello Dep. at 262.

Every trade made by [the broker] was approved by [the Vice President], and he generally did not approve transactions until he had obtained the approval of [the Chairman].... He may not have been an expert in the market, but he knew enough to know that trading on margin and in options was very risky." *Id.* at 533–34.

The fact that the Bank, in hindsight, wishes it had investigated the potential risks more thoroughly before choosing to invest, does not cause this Court to agree that it can be reasonably found to be an unsophisticated investor. No reasonable jury, based on the record in this case, could, in the view of this Court, find that the Bank was an unsophisticated investor. *See Cooke, supra,* 998 F.2d at 1260 ("[t]he essence of the [summary judgment] inquiry ... is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' ") (citation omitted).

To conclude that the Bank was unsophisticated, or that on the basis of the circumstances presented in this case that there is even a material dispute as to the Bank's sophistication, would place too heavy a burden upon investment brokers such as Alex. Brown to supply its presumably sophisticated institutional clients with non-requested information, in order to protect themselves against lawsuits, such as this one, should an investment go sour. The defendants in this case, reasonably believed that, in Banca Cremi, they were dealing, at least to a considerable extent, at arms-length, with a sophisticated client. When dealing with such a customer, a broker's explanation of risks may appropriately be more general, than if the customer were inexperienced in financial matters. *See Leib v. Merrill Lynch, Pierce, Fenner & Smith,* 461 F.Supp. 951, 953 (E.D.Mich.1978) ("where the customer is uneducated or generally unsophisticated with regard to financial matters, the broker will have to define the potential risks of a particular transaction carefully and cautiously. Conversely, where a customer fully understands the dynamics of the stock market or is personally familiar with a security, the broker's explanation of such risks may be merely perfunctory.") *aff'd* 647 F.2d 165 (6th Cir.1981); *State v. Morgan Stanley & Co., Inc.,* 194 W.Va. 163, 459 S.E.2d 906, 914 n. 17 (1995) ("[T]o say that Morgan Stanley could not reasonably have relied on [West Virginia's Associate Treasurer's and the Director of Investment's] undisputed and very earnest representations [of comprehension] ... is tantamount to confessing that West Virginia officials must at all times be treated as either children or incompetents.... [C]ompetent adults who do not need to be led around on a leash do, occasionally, buy a piece or two of blue sky.")

As indicated *supra,* some case law teaches that where there is an omission, in opposition to the claimed inference of reliance on that omission, there is somewhat more of a burden on the defendant to show that information was offered or available. But looking at this case from that view, it must be recognized that even if the defendants' offerings of additional information were not as specific as they could have been, such as "Would you like additional information on the potential price, yield or liquidity risks?," that lack of specificity does not preclude summary judgment because anyone experienced in dealing with brokers, particularly with brokers as established as these, would and should know that the defendants would promptly and readily make additional information available if the customer wanted it. Indeed, as Dean Robert Clark has observed: "Institutional investors are usually sophisticated and powerful enough to demand and get the information they need before committing their money. The legal system does not have to protect them with a superimposed mandatory disclosure system." Fletcher, *Sophisticated Investors, supra,* at 1153–54.

Perhaps having anticipated the conclusion that the Bank was a sophisticated investor, the Bank argues that securities laws exist to protect even sophisticated investors from fraudulent misrepresentations—"the Securities Exchange Act is not intended to provide protection only for uninformed or unsophisticated investors ... [as 'f]raud may also be perpetrated upon the powerful and the sophisticated.' " *Carroll v. First Nat'l Bank,*

413 F.2d 353, 357 (7th Cir.1969) (Cummings, J.) (plaintiffs were securities dealers who alleged a § 10(b) violation arising from fraudulent or misleading statements) (citation omitted), *cert. denied,* 396 U.S. 1003, 90 S.Ct. 552, 24 L.Ed.2d 494 (1970). However, it does not necessarily follow that each investor is as susceptible to fraud as any other.[54] As Chief Judge Irving Kaufman wrote: "[t]he securities laws were not enacted to protect sophisticated business [people] from their own errors of judgment. Such investors must, if they wish to recover under federal law, investigate the information available to them with the care and prudence expected from people blessed with full access to information." *Hirsch v. du Pont,* 553 F.2d 750, 763 (2d Cir.1977) (noting that the disappointed investors received all the information they requested).

Having determined that the first, and, in the case of an institutional investor, probably the most significant factor, of the justifiable reliance inquiry goes against the Bank, the Court will briefly address the other factors.

The Bank argues that the relationship between Epley and Buentello was such that it led the Bank to rely on his recommendations.[55] However, that assertion must be considered in the context of the proffered evidence in the record which shows that the Bank was frequently solicited by other brokers competing with Alex. Brown for the Bank's CMO business.[56] Those solicitations included materials, such as the Pinocchio article in Barron's mentioned above, which detailed the potential rewards and the potential risks associated with investing in CMO's. Moreover, the Bank's own documents reveal that it's employees were authorized to invest with several firms in addition to Alex.

Brown.[57] Indeed, on at least one occasion, Buentello's superiors instructed her to deal with a broker other than Alex. Brown.[58] That she selected the other firm, Southwest Securities, based apparently, at least in part, on defendants' recommendation does not negate the intention of her superiors.

As indicated above, the Bank received information about CMO investment opportunities from both the defendants and other brokers. That strongly suggests that if the Bank had desired additional information which it believed was relevant to its investment decision, it would certainly have had access to such information, either from Alex. Brown or its competitors. However, on this issue, the Bank claims its reliance on the defendants for information was justifiable by pointing to a statement made by the defendants that the Bank relied upon them to provide analytical information regarding "new issue" securities.[59] But, defendants' statement does not eliminate the Bank's obligation to exercise due diligence in determining if the analytical information provided to it was sufficient to inform its decision to invest. Moreover, there is no indication in the record that the Bank ever requested such analyses from defendants in addition to the information already provided, thereby conveying the message to the defendants that the Bank was satisfied with the level of information supplied. *See Martin v. Steubner,* 485 F.Supp. 88, 92–93 (S.D.Ohio 1979), *aff'd,* 652 F.2d 652 (6th Cir.1981), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1013, 71 L.Ed.2d 302 (1982).

The defendants do not appear in any way to have concealed or precluded any opportunity to detect the alleged fraud in this case. In Epley's written response to the Pinocchio

---

**54.** Plaintiffs' reliance on *Straub v. Vaisman & Co., Inc.,* 540 F.2d 591 (3d Cir.1976), in which an individual plaintiff "experienced and well-acquainted with the securities industry" won a 10(b) claim, is misplaced. *Straub* involved "flagrantly fraudulent conduct" by the seller of securities, and was decided in the context of a "combination of circumstances" existing in that case. *Id.* at 593, 598. Those circumstances are not present herein.

**55.** Buentello Aff. at ¶¶ 20, 21.

**56.** The record indicates that the Bank received materials from Paine–Webber; Prudential Securities; Bankers Trust Co.; Lehman Bros.; Yamaichi International; and Chemical Securities, Inc. *See* Defs.' Mot. for Summ.J. at Ex. 26–32.

**57.** *See id.* Ex. 33A at 1.

**58.** *See* Buentello Dep. at 229–30.

**59.** The parties agree that there is less publicly available information for "new issue" securities, such as those in question herein, than for securities which have existed longer.

article, for example, he addressed the Bank's concerns, albeit downplaying the risks. Moreover, the exercise of due diligence by the Bank would have further revealed the extent of the risks of CMO investing, even if the defendants' actual disclosures and statements did not adequately do so.

In the instant case, the record does not specify which side initiated each of the transactions at issue. It is clear, however, that on each occasion, the final decision to invest was made by employees of the Bank.

Finally, with regard to the generality or specificity of the alleged misrepresentations or omissions, in the instant case, the thrust of plaintiffs objections to the defendants' statements appear to be that those statements were erroneous and misleading because they were too general. For example, plaintiffs object to certain general statements made by defendants as to the low amount of risk involved. The Approval Memorandum, for example, states that inverse floaters carry "relatively low risk levels." [60] However, in view of the complex nature of the securities at issue and the Bank's duty of reasonable diligence, such general statements, even if erroneous, would not appear to be sufficiently out-of-line so as to counter the Bank's sophistication.

In conclusion, if the Bank, in anticipation of investing tens of millions of dollars in CMO's, believed that defendants' disclosures with regard to coupon, price volatility or liquidity risk, or any other risk, were insufficient, it should and could have exercised reasonable diligence to learn more. Having failed to proffer evidence that it did so—or how it did so—the Bank's claim of securities fraud necessarily fails.

### 4. Proximate Cause

The fourth element of a Section 10(b) claim which the Bank must prove is that the alleged misrepresentations and omissions were a proximate cause of the Bank's damages. The defendants argue that the losses were caused by unforeseen market events (namely the Spring 1994 collapse of the CMO market), whereas the plaintiffs claim the losses arose as a result of the realization of non-

disclosed risks inherent in the securities. In view of the Bank's failure to establish one or more of the elements required to satisfy Section 10(b), including justifiable reliance, this Court need not address in any great detail the issue of what caused the Bank's losses. While that disagreement between the parties may, perhaps, as plaintiffs urge, constitute a disputed factual issue, it is not a material one under the circumstances of this case, and therefore, it does not preclude summary judgment for the reasons stated above.

In conclusion, with respect to the alleged fraud, plaintiffs may have proffered evidence that defendants understated the extent of some of the risks, and that, in a few particular instances, that defendants supplied the Bank with inaccurate or incomplete information which tended further to understate the risks. However, those particular instances of misstatements must be viewed in the context of the other—and many—accurate disclosures made by defendants and the sophistication of the Bank. Thus, even if factual disputes exist as to whether defendants misled the Bank or omitted information, the Bank, particularly in view of its sophistication and experience, is precluded in those regards, in this case, from recovery as a result of its failure to exercise reasonable diligence to understand the nature of its investments—if indeed the Bank did so misunderstand—which this Court greatly doubts.

### B. Unsuitability

■ To prove a claim of unsuitability under Section 10(b), a plaintiff must show: "(1) that the securities purchased were unsuited to the buyer's needs; (2) that the defendant knew or reasonably believed the securities were unsuited to the buyer's needs; (3) that the defendant recommended or purchased the unsuitable securities for the buyer anyway; (4) that, with scienter, the defendant made material misrepresentations (or, owing a duty to the buyer, failed to disclose material information) relating to the suitability of the securities; and (5) that the buyer justifiably relied to its detriment on the defendant's fraudulent conduct." *Brown v. E.F.*

---

60. Approval Memorandum at BC 001977.

*Hutton Group, Inc.*, 991 F.2d 1020, 1031 (2nd Cir.1993).

■ Sophisticated investors have difficulty establishing suitability claims. *See, e.g., Xaphes v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 632 F.Supp. 471, 481–483 (D.Me. 1986). Also, since the record indicates that the Bank directed the purchases, the transactions may well be excluded from the suitability requirement. *See Associated Randall Bank v. Griffin, Kubik, Stephens & Thompson, Inc.*, 3 F.3d 208, 212 (7th Cir.1993) (applying Wisconsin law). As Judge Easterbrook indicated in *Associated Randall Bank*, "[f]ederal securities law also requires brokers and dealers acting as agents to procure 'suitable' securities. But federal law requires this only when the agents exercise discretion over the accounts. Customer-directed transactions fall outside the 'suitability' requirement." *Id.* at 212.

However, even if the Bank is able to invoke the suitability doctrine, such a claim may not succeed in this case since "[a]nalytically, an unsuitability claim is a subset of the ordinary § 10(b) fraud claim." *Brown,* 991 F.2d at 1031. Accordingly, for the same reasons which cause plaintiffs' fraud claim to fail, plaintiffs' unsuitability claim also fails, regardless of whether the investments were suitable for the Bank. Thus, even though a factual dispute may exist as to whether the Bank fully communicated its conservative investment criteria to defendants and even though the CMO purchases made by the Bank might not have met each of those criteria, because the Bank has not shown justifiable reliance in connection with any alleged misstatement or omission, the Bank cannot recover for unsuitability.

## C. *Markups* [61]

■ The Bank additionally alleges that the defendants fraudulently charged excessive markups and failed to disclose the amount of the excessive markup taken on each transaction in violation of section 10(b). In *Ettinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 835 F.2d 1031 (3d Cir.1987), Judge Seitz wrote:

> The SEC has established through its enforcement actions the principle that charging undisclosed excessive commissions constitutes fraud. This fraud is avoided only by charging a price which bears a reasonable relation to the prevailing price or disclosing such information as will permit the customer to make an informed judgment upon whether or not he will complete the transaction.

*Id.* at 1033 (citations omitted) (internal quotation marks omitted). With respect to the issue of excessive markups, the Bank apparently is going beyond the six securities primarily at issue herein, and claiming that some 19 CMO transactions carried excessive markups.[62] Even if they were excessive, those markups, of course, do not constitute a proximate cause of any investment losses, as such, by the Bank. But, the Bank could still independently recover for an excessive markup.

The defendants do not dispute that the markups in connection with these transactions were not disclosed. However, the Bank's claims of excess are rather fatally undercut by the undisputed proffered evidence that, as a matter of general policy, the Bank did not inquire about, or express any concern about the amount of any markups. According to the deposition testimony of Aguirre and Mendez, so long as the Bank believed the total price of an investment transaction was acceptable, the amount of the broker's markup was not a consideration in its decision to invest.[63] Indeed, the deposition testimony of the Bank's expert was that it is not customary in the industry for broker-dealers to disclose the amount of mar-

---

**61.** A markup is the difference between the price a broker pays for a security and the price at which the broker then sells it to his customer. For example, if the broker buys at 100 and sells to his customer at 102, the markup is 2%.

**62.** Some of those transactions may have involved Epley's former employer, MMAR Group and thus relate only to Epley and not to Alex. Brown. In any event, this Court will consider in this Opinion all of the Bank's excessive markup contentions.

**63.** Aguirre Dep. at 84–86; Mendez Dep. at 56–57.

kups or markdowns.[64] It would be unfair to the defendants, in the light of the record in this case, to allow the Bank now to claim that the amount of the markups was material, when during the time of the transactions, the Bank, according to the deposition testimony of its employees, did not proceed as though they were.

What the Bank appears to urge is that the markups were fraudulently excessive in and of themselves. A markup is only excessive if it does not bear a reasonable relationship to the prevailing market price. *See, e.g., Ettinger, supra,* 835 F.2d at 1033. Each trade, at least to a great extent, must be treated separately in determinations of excessive markups: "[The brokers] argue that markups on individual transactions are irrelevant; instead, they suggest that average markups per customer should be examined. This suggestion would result in an administratively cumbersome and unworkable rule and is not consistent with well-established law."[65] *F.B. Horner & Assoc., Inc. v. S.E.C.,* 994 F.2d 61, 63 (2d Cir.1993). This Court agrees that relying solely on averages is unwise, but that does not, in this Court's view, mean that some consideration of averages, in some instances, may not provide one of the guiding factors in determining if a markup is excessive.

The excessive markups alleged herein by the Bank range from 1.78% to 5.25%, with a weighted average of 2.78%.[66] In connection with markups, the National Association of Securities Dealers (NASD) has indicated a 5% Guideline or Policy as a standard for the industry as a whole, while also noting that under certain conditions a markup over 5% may be justified, but that under certain other circumstances a markup of 5% or lower may not be justified. *See First Indep. Group, Inc. v. S.E.C.,* 37 F.3d 30, 32 (2d Cir.1994)

("In general, markups in excess of 5% of the prevailing market price are not justified.") (citing NASD Rules § 4, Interpretation of the Board of Governors—NASD Markup Policy); 4 ALAN R. BROMBERG & LEWIS D. LOWENFELS, BROMBERG & LOWENFELS ON SECURITIES FRAUD AND COMMODITIES FRAUD at § 15.10(500) (1994). In litigated cases, the SEC apparently has not concluded that markups or markdowns of less than 4% are excessive, and has not deemed markups or markdowns of less than 7% to be fraudulent.[67] In the instant case, only three of the markups were over 4%, including one markup at 4.99% (yielding markup revenue of $6,036), and two at 5.25% (yielding markup revenue of $595 and $43,467), and none of them exceeded 7%. Among the factors considered by the NASD in determining the reasonableness of markups is the amount of money involved in a transaction—"[a] transaction which involves a small amount of money may warrant a higher percentage of markup to cover the expenses of handling." *Id.* (quoting NASD Markup Policy, NASD Manual CCH ¶ 2154.) In the within case, the three highest markups yielded three of the four lowest revenues, indicating that in the context of the pattern of trading going on, they involved small amounts of money.

Plaintiffs' proffered evidence that the markups were excessive seems to consist primarily of Midanek's opinion, namely, that in his view, "it is difficult to conceive of any service that would help justify markups larger than one percent."[68] That view, however, would not seem consistent with a recent decision of the NASD in which the NASD's National Business Conduct Committee declined to penalize brokers who charged markups and markdowns of up to 4.7% on CMO-derivative products.[69] Apparently the National Business Conduct Committee felt it could not "conclude that [the brokers] fraudulently

**64.** *See* Midanek Dep. at 216–20.

**65.** In the summary judgment context of this case, this Court accepts as true the Bank's proffer of evidence that other Alex. Brown customers were charged lower markups in connection with sales of other securities. *See* Pls.' Supp.Mem. Regarding Excessive Undisclosed Markups. That proffered evidence is weighed in this Opinion.

**66.** *See* Midanek Aff. dated 9/26/96 at ¶ 11.

**67.** *See* October 22, 1996 Decision by National Business Conduct Committee of NASD, *In the Matter of District Business Conduct Committee v. MMAR Group, Inc.* ("NASD Decision") at 14.

**68.** Midanek Rep. at 36.

**69.** *See* NASD Decision at 18.

## 520

charged markups or mark-downs unreasonably in excess of prevailing market prices in view of the dearth of NASD and SEC guidance regarding markups in CMO-derivative products, the lack of persuasive evidence regarding industry standards and practice, and the fact that this was a relatively new type of security for which industry experience was evolving." [70] While this Court is not bound by the National Business Conduct Committee's conclusion, it does note that one of the investment industry's internal governing bodies apparently could not determine the appropriate prevailing market price for CMO-derivatives during this period.

One of the allegedly excessive markups merits further discussion—the 5.25% markup which yielded $43,467. Defendants' expert has conceded that he could not find justification for that markup.[71] However, the record does not contain any detailed facts concerning how the markups were established, in connection with that or any other transaction in this case. Accordingly, while the $43,467 markup provides good cause for the raising of eyebrows, this Court, without any evidence of the facts of that transaction, the complexity or difficulty of it, the amount of work performed by the brokers in connection with it, etc., is not able to determine that it is excessive. After all, the burden is on the Bank to prove excess—and the amount of excess—and that the Bank has just not done—unless the $43,467 figure itself or a 5% or less percentage guideline suffices—an arbitrary type of approach which this Court declines to follow, particularly in the light of the course of dealing between the parties and the fully undisputed fact that the Bank never inquired about or indicated the slightest dissatisfaction with any markup charged by defendants. Indeed, the Bank was seemingly totally satisfied with all of the arrangements between broker and customer, as long as the investments in question were flying high. Accordingly, this Court concludes that there is insufficient reason to deny summary judgment as to the issue of excessive markups.

### D. Circular 292

■ There appears to be a factual dispute as to whether Epley told Bank officials that any of the investments in issue in this case could not be used to meet a Mexican regulation (known as Circular 292), which required that at least 15 percent of a Mexican bank's liabilities be invested in highly liquid securities with terms which matured in one year or less. Epley met with officials of the Bank of Mexico to determine whether the CMO's met Circular 292 and has stated that he learned that the CMO's did not. Epley says that he then informed Bank officials, including Buentello, of that fact, but Buentello says Epley never gave her any such information.

An omitted fact is material "if there is a 'substantial likelihood that disclosure would have been viewed by the reasonable investor as having significantly altered the total mix of information available.'" *In re Delmarva Securities Litigation,* 794 F.Supp. 1293, 1302 n. 10 (D.Del.1992) (quoting *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976) (applying different section of the Securities Exchange Act dealing with proxies)) (internal quotations marks omitted). In this case, plaintiffs have offered affidavits indicating that the Bank told defendants of the importance that the Bank's investments meet Circular 292, so the alleged omission would appear to be at least arguably material. The Bank, however, has offered nothing to indicate that it encountered any problems with Mexican law or Mexican regulatory officials as a result of any failure to comply with Circular 292. At most, any lack of disclosure by defendants as to Circular 292 would seem relevant to this case only insofar as it might have affected the Bank's understanding of the CMO's in which it invested.

In any event, in order to recover under section 10(b), the Bank, as discussed *supra,* must have exercised reasonable diligence to understand the nature of its investments. As a large, sophisticated financial institution, the Bank had the resources to find out whether the CMO's met the Circular 292

---

**70.** *Id.*

**71.** Ferri Dep. 465. That transaction was not one of the six securities primarily at issue in this case.

criteria. Buentello stated that she knew Epley was meeting with officials from the Bank of Mexico. The record, however, contains no indication that Buentello or anyone else at the Bank asked Epley about the results of the meeting. If the information was important to the Bank—as the Bank now claims it was—Bank officials should and could have asked Epley about it or should and could themselves have made some additional inquiry with Mexican officials.

## IV

The Bank contends, under Count VII, that Alex. Brown is liable as a controlling person pursuant to Section 20(a) of the Securities and Exchange Act. 15 U.S.C.A. § 78t(a). Section 20(a) provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable." *Id.* That ground for relief is without merit in view of this Court's grant of summary judgment, even if Alex. Brown were a controlling person.

## V

*Plaintiffs' state law claims* [72]

### A. Alleged Violation of Maryland Securities Act

■ In Count II plaintiffs allege violations by both defendants of the Maryland Securities Act, MID.CODE ANN., CORPS. & ASS'NS § 11–302(c). That statute prohibits misrepresentations "in dealings with advisory clients." The definition of "investment advisers" expressly *excludes* a "broker-dealer or its agent whose performance of [advisory] services is solely incidental to the conduct of his business as a broker-dealer and who receives no special compensation for them." § 11–101(f)(2)(iv). Maryland courts do not appear to have construed that sub-section, but the definition seems to exclude defen-

dants from the coverage of the Act. Neither Alex. Brown nor Epley received any "special compensation" from the Bank for advisory services other than services which they provided as part of their work as broker-dealer.

### B. Alleged Common Law Violations

■ Plaintiffs also contend that Alex. Brown and Epley are liable to the Bank under the common law theories of breach of fiduciary duty, negligence, negligent misrepresentation and fraud. The parties disagree as to which jurisdiction's substantive law governs those common law claims. There appear to be four possibilities: Texas, Maryland, Mexico and the Cayman Islands. The Bank argues that Texas law governs because that is where it claims that the alleged misrepresentations were made by Epley. In contrast, the defendants assert that the substantive law of Maryland governs the claims because some of the securities and accounts were purchased and/or maintained and serviced in Maryland. A third possibility, which is recognized as such by both sides, is the law of Mexico, the primary place where the Bank received the alleged misrepresentations and subsequently felt the alleged loss. A fourth possibility, which was not raised by either party, is the law of the Cayman Islands where one of the plaintiffs (Banca Cremi Grand Cayman) was located, and, therefore, where that plaintiff may have suffered its claimed losses.

The parties have not discussed, or in any significant way cited to, the substantive law of Mexico or of the Cayman Islands in their voluminous filings. The record in this case indicates that this Court specifically called attention to and requested that counsel address the issue of Mexican law, if either side took the position that the alleged torts took place in Mexico. Plaintiffs have taken the position that if Texas law does not govern, Mexican law is the best alternative. [73] How-

---

72. Plaintiffs have asserted diversity jurisdiction as well as federal question jurisdiction. Compl. ¶ 1. Accordingly, even though summary judgment is being granted to defendants in connection with plaintiffs' federal claims, the Bank is entitled to have this Court consider, independently, its state law claims and not to dismiss them without prejudice, *Hardy v. Birmingham Bd. of*

*Educ.*, 954 F.2d 1546 (11th Cir.1992), as it might well do if diversity jurisdiction did not exist.

73. *See* Pls.' Mem. on Choice of Law at 5 n. 4 ("If the Court finds that the place where the Bank was injured governs the common law claims, then the laws of Mexico, not Maryland, would apply.")

ever, plaintiffs did not brief the substance of Mexican law as it would apply to the instant case. The defendants mentioned a general principle set forth in the Civil Code for the Federal District of Mexico which they believe would preclude recovery on the common law claims.[74] However, as indicated in the language in footnote 74, that provision of Mexican law is most general and provides little guidance.

Federal Rule of Civil Procedure 44.1 governs the determination of foreign law; however, that Rule is silent as to the effect of failure to prove the substance of foreign law. Although the excellent counsel in this case have provided this Court with considerable legal analysis concerning most of the issues presented herein, they have provided little along those lines in connection with Mexican law, and *nothing* with respect to Cayman Islands law. That may well be due to the absence of legal precedent in those jurisdictions. In sum, this Court is satisfied that this Court and counsel have adequately explored the foreign law issue. In *Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 452 F.Supp. 1108 (S.D.N.Y.1978), the court wrote: "the parties have not sought to prove Venezuelan law . . . or asserted that it is in conflict with the law of New York. The Court itself is not obligated, under Rule 44.1, to take judicial notice of foreign law." *Id.* at 1112 n. 3, *remanded by unpublished table decision*, 607 F.2d 994 (2d Cir.1979).[75] Instead, this Court will assume that the law of both Mexico and Cayman is substantially the same as the law of either Maryland or Texas or federal law. *See Bowman v. Grolsche Bierbrouwerij B.V.*, 474 F.Supp. 725, 730 (D.Conn.1979) ("Neither party . . . has briefed or produced evidence of the substance or effect on this case of the Netherlands law. Under such circumstances, the

court will assume that the law of the Netherlands is the same as the law of Connecticut."); *see also* 9 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE §§ 2447 (1971) ("[Where] foreign law cannot be ascertained . . . [t]he court might well reconsider its initial decision that foreign law is controlling and decide instead to apply domestic law.")

This Court is obligated to follow Maryland's choice of law rules in determining which jurisdiction's substantive law applies to the Bank's state law claims in this case for breach of fiduciary duty, negligence, negligent misrepresentation and common law fraud. *See Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). For tort claims such as those, Maryland applies the *lex loci delecti* doctrine, i.e., it applies the law of the jurisdiction where the alleged wrong occurred. *See Nugent v. Curry*, 908 F.Supp. 309, 311–12 (D.Md.1995) (citing *Ward v. Nationwide Mut. Auto Ins. Co.*, 328 Md. 240, 244 n. 2, 614 A.2d 85 (1992); *Hauch v. Connor*, 295 Md. 120, 123–24, 453 A.2d 1207 (1983)); *White v. King*, 244 Md. 348, 352–55, 223 A.2d 763 (1966). It appears that Maryland courts have not yet specifically spoken as to the issue of where the "wrong" occurs in cases of pecuniary injury resulting from fraud, negligent misrepresentation or commercial negligence, when the alleged wrongful act or omission occurred in one jurisdiction and the "loss" by plaintiff in another jurisdiction. Where the Maryland courts are silent or non-specific as to the applicable rule, "this court must apply a rule which it reasonably believes would be adopted by the highest Maryland court were it to rule on the question." *Uppgren v. Exec. Aviation Serv., Inc.*, 326 F.Supp. 709, 711 (D.Md.1971) (citing

---

**74.** "Whomever, by acting illicitly or against the good customs and habits, causes damage to another shall be obligated to compensate him, unless he can prove that the damage was caused as a result of the fault or inexcusable negligence of the victim." Defs.' Mem. on Choice of Law at 3 n. 2 (citing Civil Code for the Federal District in Ordinary Matters, Article 1910).

**75.** Federal Rule of Civil Procedure 44.1 currently provides: "A party who intends to raise an issue concerning the law of a foreign country shall

give notice by pleadings or other reasonable written notice. The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law." Fed.R.Civ.P. 44.1. That Rule is substantively the same as it was in 1978, with only a technical amendment in the interim. *See* Advisory Committee Notes.

*Debbis v. Hertz Corp.*, 269 F.Supp. 671 (D.Md.1967)).

In *Santana, Inc. v. Levi Strauss & Co.*, 674 F.2d 269 (4th Cir.1982), the Fourth Circuit faced a similar situation when reviewing a case involving the forum state of North Carolina. *Santana* involved multi-state misrepresentations; the forum state (North Carolina) adhered to the doctrine of *lex loci delecti* but had not indicated how that doctrine would apply in a misrepresentation case. In *Santana*, Judge Chapman approached the problem by evaluating both the traditional *lex loci delecti* doctrine (which he described as the "place of injury") and the more modern approach set forth in the Restatement (Second) Conflicts of Laws § 148 (1971). *Id.* at 273. The Restatement (Second) approach in fraud and misrepresentation cases involves determining which state had the "most significant relationship to the occurrence giving rise to the suit." *Id.* at 273.[76] Maryland has, to this date, refused to apply the Restatement (Second) approach in any torts conflicts context, at least as to the general principles it sets forth in § 145.[77] *See Hauch v. Connor, supra,* at 123, 453 A.2d 1207 ("With regard to torts conflicts principles, we reject the position of the Restatement and adhere to the rule that the substantive tort law of the state where the wrong occurs governs.")[78]

Accordingly, it appears reasonable for this Court to believe that the highest court of

Maryland would adhere to *lex loci delecti* in multi-state misrepresentation cases over the "most significant relationship" approach. However, questions still remain in the within case with respect to the application of *lex loci delecti*. For instance, is the place of the wrong the place of the injury (apparently Texas where the alleged misrepresentations or other wrongful acts took place) or the jurisdiction where the loss was felt (presumably where the Bank was located)? An examination of the use of *lex loci delecti* in other multi-state tort contexts provides some guidance. For instance, in a wrongful death action, the Fourth Circuit, applying Maryland's choice of law rules, has determined that it is the law of the place of injury, not that of the place of death (loss) which governs. *See Farwell v. Un,* 902 F.2d 282, 286–87 (4th Cir.1990). Thus, *Farwell* suggests that the law of Texas would control in the instant case.

The Bank argues that an appropriate analogy can be drawn from claims arising from personal injury torts. For example, in *Sacra v. Sacra,* 48 Md.App. 163, 167, 426 A.2d 7 (1981), a case involving an automobile collision in Delaware which propelled one of the vehicles over the Maryland state line and into a Maryland-located utility pole, the Court of Special Appeals of Maryland concluded that the substantive law of Delaware governed since "[t]he fact that the state line intervened between the impact and death

---

76. "(2) When the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made, the forum will consider such of the following contacts, among others, as may be present in the particular case in determining the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties:

(a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,

(b) the place where the plaintiff received the representations,

(c) the place where the defendant made the representations,

(d) the domicil, residence, nationality, place of incorporation and place of business of the parties,

(e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

(f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant." Restatement (Second) of Conflicts § 148 (1971).

77. "The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence, and the parties." Restatement (Second) Conflict of Laws § 145 (1971).

78. If this court were to apply the "most significant relationship" rationale, the factors would appear to cut in favor of either Mexico or Texas. There is little indication that it would be Maryland or Cayman. But since, as noted, this Court will not apply Mexican law, that approach may still require that this Court apply Maryland law.

was merely a fortuitous situation," *id.* at 166, 426 A.2d 7, and "it was only because of the harm in Delaware that the appellant has any claim." *Id.* at 167, 426 A.2d 7. Relying on that personal injury approach, the Bank argues that Texas law should apply because the wrongful conduct which caused the Bank's injuries, i.e., the alleged misrepresentations and omissions by Alex. Brown and Epley, occurred primarily in Texas.[79] Defendants dispute the relevance of automobile accident cases in a case like this one, and instead, urge the Court to look to the case law of other jurisdictions which have applied the doctrine of *lex loci delecti* in the context of alleged multi-state misrepresentational torts. Some of the cases upon which defendants rely express the view that the place of the wrong is not the place where the alleged misrepresentations were made, but rather the place where the plaintiff suffered the loss as a result of the misrepresentations. *See, e.g., Vanity Fair Mills v. T. Eaton Co.,* 234 F.2d 633, 639 (2d Cir.), *cert. denied,* 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956) ("the place of the wrong is not where the fraudulent statement was made, but where the plaintiff, as a result thereof, suffered a loss"); *Hester v. New Amsterdam Cas. Co.,* 287 F.Supp. 957, 972 (D.S.C.1968) ("In the case of fraudulent misrepresentation the law of the place of the wrong ... is not where the misrepresentations were made but where the plaintiff as a result of the misrepresentation suffered a loss.") *aff'd in part,* 412 F.2d 505 (4th Cir.1969). In the instant case, if the place of the loss controls, the law of Mexico or of Cayman would apply and that, as discussed, supra, would lead, in the context of the record in this case, to this Court applying the law of the forum state, Maryland.

Thus, in the absence of anything like complete guidance from the Maryland courts, this Court, in determining which law to apply in this case where the loss may have been experienced in a state other than the state in which some of the alleged misrepresentations or omissions occurred, faces a rather difficult exercise. However, it appears, in common sense, that the law to utilize is that of Texas.

Accordingly, this Court will discuss the four claims of plaintiffs under Texas law, pointing out differences from the law of Maryland, if any.

### 1. Breach of Fiduciary Duty

Under Texas law, a claim for breach of fiduciary duty has three elements: (1) the existence of a fiduciary duty owed to the plaintiff; (2) a breach of that duty; and (3) that breach was the proximate cause of the damage to the plaintiff. *See Duncan v. Lichtenberger,* 671 S.W.2d 948, 953 (Tex.App. 1984). The Bank's within claim fails on the first element. Under certain circumstances, the relationship between a securities broker and its customer can be that of principal and agent, thereby creating a fiduciary duty. *See Magnum Corp. v. Lehman Bros. Kuhn Loeb, Inc.,* 794 F.2d 198, 200 (5th Cir.1986). However, the record in this case shows that the relationship between the Bank and the defendants was not that of principal and agent. Rather, the Bank and the defendants dealt at arms length, in a principal to principal relationship. *See* Aguirre Dep. at 84–86; Mendez Dep. at 55–57. As discussed *supra,* the record indicates that the Bank made independent decisions about its investments and did not surrender control of its accounts to the defendants. *See Rauscher Pierce Refsnes, Inc. v. Great Southwest Savings, F.A.,* 923 S.W.2d 112, 116 (Tex.App.1996) (written agreements specified that broker would be "exclusive agent" of customer). As the Bank is unable to establish the first element of the breach of fiduciary duty claim, that claim fails. The Bank fares no better under Maryland law. *See First Fed. Sav. & Loan v. Equitable Bank,* 1988 WL 167703 at *7 (D.Md.1988). (Harvey, C.J.).

### 2. Negligence

To prevail in connection with the negligence claim under either Texas or Maryland law, the Bank needs to show the following elements: 1) legal duty owed by the defendants to the Bank; "2) breach of that duty; and 3) damages proximately re-

---

**79.** This Court notes that by their nature omissions may not necessarily occur in any particular jurisdiction—though they may be treated as having occurred in the place where the alleged wrongdoer conducted his business.

sulting from the breach." *See Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523, 525 (Tex.1990); *see also Jacques v. First Nat'l Bank,* 307 Md. 527, 531, 515 A.2d 756 (1986).

The Bank cites two cases which it argues makes the defendants liable under Texas law. In *Rauscher, supra,* the Court of Appeals of Texas, observed that a broker is "bound to disclose to his employer all material facts within his knowledge affecting any transaction." *Rauscher,* 923 S.W.2d at 115 (Tex. App.1996). Similar language is found in the other case mentioned by plaintiffs, *Magnum,* which states that "[t]he law imposes upon the broker the duty to disclose to the customer information that is material and relevant to the order." *Magnum, supra* at 200. However, neither of those cases requires denial of summary judgment under the circumstances of the within case. In *Rauscher,* the broker was the "exclusive agent" of the customer, and thus his duty to disclose facts arose out of his fiduciary obligation to the customer— an obligation which did not exist in the light of the record in the within case. *See Rauscher,* 923 S.W.2d at 114. In *Magnum,* the scope and duration of the broker's duty was limited to the time needed to execute the customer's order. *Id.* at 200; *see also Robinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 337 F.Supp. 107, 111 (N.D.Ala. 1971) ("The relationship of agent and principal only existed between plaintiff and defendant when an order to buy or sell was placed, and terminated when the transaction was complete. That is, defendant was a broker and nothing more.... The result is that at the time of the acts complained of ... there was no 'fiduciary relationship' between the parties."), *aff'd,* 453 F.2d 417 (5th Cir.1972). Accordingly, the negligence claim fails under Texas law.

In addition, unlike Texas, which has adopted the comparative negligence approach, Maryland continues to recognize the doctrine of contributory negligence. *See Harrison v. Montgomery County Bd. of Educ.,* 295 Md. 442, 463, 456 A.2d 894 (1983). Under that doctrine, even if the defendants were negligent—which this Court doubts they were—the Bank, in light of its sophistication and in view of the uncontroverted facts in this case, would seem precluded under Maryland law from recovery based upon what this Court views as its contributory negligence.

### 3. Negligent Misrepresentation

■ The Bank's negligent misrepresentation claim fails under Texas and Maryland law because one of the elements of the claim under either state's law is justifiable reliance. *See Federal Land Bank Ass'n v. Sloane,* 825 S.W.2d 439, 442 (Tex.1992); *Doe v. Prudential Ins. Co.,* 860 F.Supp. 243, 253 (D.Md. 1993) (citing *Gross v. Sussex, Inc.,* 332 Md. 247, 259, 630 A.2d 1156 (1993)). As discussed *supra,* the plaintiffs have failed sufficiently to demonstrate justifiable reliance. Accordingly, that claim lacks merit.

### 4. Fraud

■ The common law fraud claim fails for the same reasons the federal fraud claim failed, i.e., the Bank's federal fraud claim does not prevail, and neither can its state law claim.[80] The elements of fraud under Texas law are very similar to the federal 10b–5 elements. To prevail, a plaintiff must show: 1) "a material representation was made;" 2) it was false; 3) when he made it, the speaker "knew it was false or made it recklessly, without any knowledge of its truth and as a positive assertion;" 4) it was made "with the intention that it should be acted upon by the party; 5) that the party acted in reliance upon it; and 6) that he thereby suffered injury." *See Trenholm v. Ratcliff,* 646 S.W.2d 927, 930 (Tex.1983). Under Maryland law, the plaintiffs must show, *inter alia,* justifiable and actual reliance upon a misrepresentation. *See Smith v. Rosenthal Toyota, Inc.,* 83 Md.App. 55, 60, 573 A.2d 418 (1990), *cert. denied,* 320 Md. 800, 580 A.2d 219 (1990). That, plaintiffs, as discussed *supra,* have failed sufficiently to submit or proffer.

## VI

### Conclusion

For the reasons set forth in this Opinion, defendants' motion for summary judgment is

---

80.  *See* Pls.' Mem. on Choice of Law at 7 n. 7.

hereby granted. Judgment will be entered for defendants in a separate Order of even date herewith.

## JUDGMENT ORDER

Judgment is hereby entered for defendants in this case in connection with each and all of plaintiffs' claims herein.