Jean ETTINGER, on behalf of herself and all others similarly situated, Appellant,

v.

MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.

No. 87–1045.

United States Court of Appeals, Third Circuit.

Argued Oct. 1, 1987.

Decided Dec. 23, 1987.

David H. Weinstein (argued), Katharine M. Ryan, Kohn, Savett, Klein & Graf, David C. Harrison, Philadelphia, Pa., for appellant.

Roger J. Hawke (argued), Brown & Wood, New York City, C. Clark Hodgson, Jr., Stradley, Ronon, Stevens & Young, Philadelphia, Pa., for appellee.

Daniel Goelzer, Gen. Counsel, Jacob H. Stillman, Associate Gen. Counsel, Richard A. Kirby (argued), Asst. Gen. Counsel, Batya Roth, Atty., Paul Gonson, Sol., Securities and Exchange Com'n, Washington, D.C., for amicus curiae Securities and Exchange Com'n.

Roberta S. Karmel, Robert S. Getman, Kelley Drye & Warren, William J. Fitzpatrick, Gerard J. Quinn, Securities Industry Ass'n, New York City, for amicus curiae Securities Industry Ass'n.

Before SEITZ, GREENBERG, and HUNTER, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Circuit Judge.

Appellant Jean Ettinger appeals from the order of the district court granting appellee Merrill Lynch, Pierce, Fenner & Smith, Inc.'s ("Merrill Lynch") motion for summary judgment and denying her motion for class certification. We have jurisdiction pursuant to 28 U.S.C. § 1291 (1982).

### I.

In May and June 1984, Ettinger purchased from Merrill Lynch several zero-coupon bonds, which Merrill Lynch calls TIGR's.[1] It is undisputed that Merrill Lynch is a market maker in these securities.[2] After selling these securities several months later, Ettinger filed this action in the district court alleging that Merrill Lynch charged excessive and unconscionable mark-ups on the sale of these zero-coupon bonds and failed to disclose this compensation in violation of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1982), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 (1984). Invoking pendent jurisdiction, Ettinger also asserted breaches by Merrill Lynch of its contractual and fiduciary duties under Pennsylvania law.

Ettinger subsequently filed a motion for class action determination, and Merrill Lynch filed a motion for summary judgment. The district court granted Merrill Lynch's motion for summary judgment, holding that as a matter of law Merrill Lynch's failure to disclose allegedly excessive commissions on the sale of zero-coupon bonds did not constitute a violation of section 10(b) or Rule 10b–5; the district court denied Ettinger's motion for class certification.

---

**1.** Zero-coupon bonds are debt securities on which no interest is paid prior to maturity. At maturity, a one-time payment incorporating the principal repayment and accrued interest is made. These securities are therefore sold at a discount from face value.

TIGR's (Treasury Investment Growth Receipts) are a proprietary product of Merrill Lynch. TIGR's consist of United States Treasury bonds that have been repackaged by Merrill Lynch into zero-coupon securities. Specifi-

cally, a TIGR is a receipt that evidences ownership of a future payment of interest or principal on Treasury bonds which are purchased by Merrill Lynch and are held by a custodian for the benefit of the TIGR holder.

**2.** A market maker is defined as a dealer "who, with respect to a security, holds himself out ... as being willing to buy and sell such security for his own account on a regular or continuous basis." 15 U.S.C. § 78c(a)(38) (1982).

Ettinger appeals from the order of the district court.

## II.

### A.

Our standard of review from a grant of summary judgment is plenary. *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

We first address Merrill Lynch's contention that its compliance with the disclosure requirements of Rule 10b–10, 17 C.F.R. § 240.10b–10 (1984), exempted it from liability under section 10(b) and Rule 10b–5. Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful to utilize "any manipulative or deceptive device or contrivance" in connection with the purchase or sale of securities. Rule 10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

The Supreme Court has interpreted the federal securities laws broadly. Referring to section 10(b) and Rule 10b–5 together, the Supreme Court noted, "These proscriptions ... are broad, and by the repeated use of the word 'any,' are obviously meant to be inclusive." *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 151, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741 (1972). The Court has frequently noted that securities

legislation, explicitly including section 10(b), "must be read flexibly, not technically and restrictively." *Superintendent of Ins. v. Bankers Life & Casualty Co.,* 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971); *accord Herman & MacLean v. Huddleston,* 459 U.S. 375, 386–87, 103 S.Ct. 683, 689–70, 74 L.Ed.2d 548 (1983).

The SEC has established through its enforcement actions the principle that charging undisclosed excessive commissions constitutes fraud. "This fraud is avoided only by charging a price which bears a reasonable relation to the prevailing price or disclosing such information as will permit the customer to make an informed judgment upon whether or not he will complete the transaction." *In re Duker & Duker,* 8 S.E.C. 386, 388–89 (1939). The SEC has continually adhered to this position, *see, e.g., In re Associated Secs. Corp.,* 40 S.E.C. 10, 14 (1960), which has also received judicial approval. *Charles Hughes & Co. v. Securities & Exch. Comm'n,* 139 F.2d 434, 437 (1943), *cert. denied,* 321 U.S. 786, 64 S.Ct. 781, 88 L.Ed. 1077 (1944). Although these cases were proceedings to revoke broker-dealers' registrations taken by the SEC pursuant to section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78*o* (b), we believe that they illuminate the SEC's view as to what constitutes fraud. They therefore have applicability in the context of private actions brought under the antifraud provisions of Rule 10b–5.

■ Thus, we have no doubt that, at least prior to the enactment of Rule 10b–10 in 1977, the alleged fraudulent actions of Merrill Lynch would have been actionable under section 10(b) and Rule 10b–5.

This brings us to Merrill Lynch's contention, accepted by the district court, that the language and history of Rule 10b–10 show an intention to exempt brokers from liability under Rule 10b–5 for not disclosing allegedly excessive mark-ups in transactions by market makers in debt securities, such as Merrill Lynch's sale of TIGR's to Ettinger. Rule 10b–10 was first proposed by the SEC in 1976 and was adopted in slightly revised form in 1977. Rule 10b–10 is enti-

tled "Confirmation of Transactions" and sets forth various disclosures that a broker or dealer must make to customers in writing at or before the completion of certain transactions.[3] In its release announcing the adoption of this rule, the SEC stated:

> The rule does not attempt to set forth all possible categories of material information to be disclosed by broker-dealers in connection with a particular transaction in securities. Rule 10b–10 only mandates the disclosure of information which can generally be expected to be material. Of course, in particular circumstances, additional information may be material and disclosure may be required.

Securities Exchange Act Release No. 13,-508 [1977–1978 Decisions] Fed.Sec.L.Rep. (CCH) ¶ 81,143, at 87,930 n. 28 (May 5, 1977).[4]

Subsequent to the initial adoption of Rule 10b–10, the SEC released various proposed amendments to the rule and adopted some of these amendments in modified form in light of public comments. In 1978, the SEC brought within the rule dealers acting as "riskless principals" (only dealers acting as agents were covered originally) in transactions involving equity securities; the SEC specifically deferred a decision on the applicability of the rule to transactions in debt securities. Securities Exchange Act Release No. 15,219 [1978 Decisions]

Fed.Sec.L.Rep. (CCH) ¶ 81,746 (Oct. 6, 1978). The SEC noted,

> [A] market maker may often engage in transactions that effectively offset one another, giving the appearance of being "riskless" principal transactions, even though the market maker did not structure any particular pair of transactions as offsetting, "riskless" principal transactions. As a result, the problem of identifying when a "riskless" principal disclosure might have to be made could create substantial practical and interpretive difficulties for a bona fide market maker. For that reason, the [SEC] has determined to provide an exemption from the riskless principal disclosure requirement for ... market makers....

*Id.* at 80,974. The limited scope of this exemption from the strictures of Rule 10b–10 for market makers is highlighted by *In re Alstead, Dempsey & Co.*, Securities Exchange Act Release No. 20,805 [1984 Decisions] Fed.Sec.L.Rep. (CCH) ¶ 83,607 (Apr. 5, 1984). In this disciplinary proceeding against a broker-dealer who charged excessive commissions in over 300 transactions in equity securities in which he acted as a market maker, the SEC conclued that the market maker "violated the antifraud provisions of Section 17(a)(1) of the Securities Act *and* Section 10(b) of the Securities Ex-

---

**3.** In 1984 when the transactions at issue in this case occurred, Rule 10b–10 provided in pertinent part:

(a) It shall be unlawful for any broker or dealer to effect for or with the account of a customer any transaction in, or to induce the purchase or sale by such customer of, any security (other than U.S. Savings Bonds or municipal securities) unless such broker or dealer, at or before completion of such transaction, gives or sends to such customer written notification disclosing:

....

(4) In the case of a transaction in a debt security effected exclusively on the basis of dollar price

(i) The dollar price at which the transaction was effected, and

(ii) The yield to maturity calculated from the dollar price..:.

(5) In the case of a transaction in a debt security effected on the basis of yield

(i) The yield at which the transaction was effected including the percentage amount ...

(ii) The dollar price calculated from the yield at which the transaction was effected ...

....

(8) If he is acting as principal for his own account:

(i) The amount of any mark-up, mark-down, or similar remuneration received in a transaction in an equity security if he is not a market maker in that security ...

(ii) In the case of a transaction in an equity security, whether he is a market maker in that security....

**4.** In this same release, the SEC announced that it was rescinding Rule 15c1–4. *See* 17 C.F.R. § 240.15c1–4 (1976). This rule, also entitled "Confirmation of Transactions," applied only to transactions other than on national securities exchanges and required a broker-dealer acting as a dealer to disclose only the capacity in which it acted.

change Act and Rule 10b–5 thereunder." *Id.* at 86,742 (emphasis added).

In 1982, the SEC withdrew a proposed amendment to Rule 10b–10 that it had published in 1978. Securities Exchange Act Release No. 15,220 [1978 Decisions] Fed. Sec.L.Rep. (CCH) ¶ 81,747 (Oct. 6, 1978). The amendment would have required broker-dealers (other than market makers) engaging in "riskless principal" transactions in non-municipal debt securities to disclose the mark-ups. *Id.* at 80,980. In announcing the withdrawal of the proposal, the SEC stated that the amendment "would not achieve the purposes [of deterring pricing abuse] at an acceptable cost and that there are alternative ways of achieving the same goals with fewer adverse side effects." Securities Exchange Act Release No. 18,-987 [1982 Decisions] Fed.Sec.L.Rep. (CCH) ¶ 83,245 at 85,259 (Aug. 20, 1982). The Commission, however, stressed that it would "maintain close scrutiny to prevent excessive mark-ups and take enforcement actions where appropriate." *Id.* [5]

On the same day, the SEC proposed an amendment to Rule 10b–10 requiring the disclosure of yield information. Securities Exchange Act Release No. 18,988 [1982 Decisions] Fed.Sec.L.Rep. (CCH) ¶ 83,246 (Aug. 20, 1982). The SEC labeled this proposal "a means of discouraging potentially deceptive practices." *Id.* at 85,264. Finally, in 1983, the SEC adopted the requirement that yield be disclosed and indicated that "[y]ield has been characterized as the single most important piece of information to an investor in the context of a transaction in debt securities." Securities Exchange Act Release No. 19,687 [1982–1983

Decisions] Fed.Sec.L.Rep. (CCH) ¶ 83,341, at 85,893 (April 18, 1983).[6]

Merrill Lynch argues from the foregoing that over this period the SEC specifically considered and rejected various proposals that would have brought the transactions at issue here under the mark-up disclosure requirements of Rule 10b–10. From this, it asserts that it is shielded from liability under the anti-fraud provisions of Rule 10b–5.

First of all, we think Merrill Lynch's formulation of the approach to the impact of Rule 10b–10 is faulty. Since we have decided that Ettinger would have stated a claim under Rule 10b–5 prior to the adoption of Rule 10b–10, Merrill Lynch must show that the Commission intended to abrogate such a claim in its actions relating to Rule 10b–10. We turn to that issue.

Throughout the process of adopting and amending Rule 10b–10, the SEC has maintained that "additional information may be material and disclosure may be required"; the SEC narrowly construed the exemption for market makers in its enforcement actions. Although it did not mandate disclosure of mark-ups in transactions of debt securities, the SEC stressed that it would "also maintain close scrutiny to prevent excessive mark-ups and take enforcement actions where appropriate"; similarly, although it noted that yield may be "the single most important piece of information" in debt transactions, the SEC never indicated that yield is the exclusive datum required or even that yield by itself is sufficient to permit a customer to make an informed investment decision.

We believe that these statements by the SEC, the noticeable lack of any

---

5. The SEC has in fact undertaken such actions. For example, the SEC charged a broker-dealer with exacting " 'fraudulently excessive and unfair prices' on many transactions with markups frequently in excess of 10%" on various debt securities, including certain zero-coupon bonds. *Securities and Exch. Comm'n v. MV Secs., Inc.,* No. 84 Civ. 1164 (CLB) (S.D.N.Y.) [Available on WESTLAW, 1984 WL 2393] (issuance of complaint, SEC Litigation Release No. 10,289, 29 S.E.C. Docket 1454, 1455 [1983–1984 Decisions] Fed.Sec.L.Rep. (CCH) ¶ 99,677 (Feb. 21, 1984); issuance of permanent injunctions, SEC

Litigation Release No. 10,474, 31 S.E.C. Docket 61 (July 27, 1984)).

6. Because the transactions at issue in this case occurred in 1984, we need not consider SEC actions in 1985 in which all broker-dealers were required to disclose in transactions in "reported securities" the "trade price" (prevailing market price), the price to the customer, and the difference, if any, between the two. *See* Securities Exchange Act Release 22,397 [1985–1986 Decisions] Fed.Sec.L.Rep. (CCH) ¶ 83,912 (Sept. 11, 1985).

reference in SEC documents to the exclusivity of the provisions of Rule 10b–10, and, finally, but of decisive significance, the absence of any language in Rule 10b–10 carving out a limitation to the traditional actions under Rule 10b–5 for fraud of this nature negate the contention advanced by Merrill Lynch. We hold that a broker-dealer's compliance with the disclosure requirements of Rule 10b–10 does not, as a matter of law, shield it from possible liability under Rule 10b–5.[7]

Merrill Lynch argues that, in any event, it was entitled to summary judgment because Ettinger failed to support her Rule 10b–5 allegations with the requisite factual showing. Our reading of the opinion of the district court convinces us that the district court based its summary judgment decision solely on the ground that Rule 10b–10 grants to market makers an exemption from the requirement of disclosing mark-ups and that the rule did not in 1984 require disclosures of mark-ups in transactions in debt securities. Thus, the district court did not address Merrill Lynch's separate argument that Ettinger failed to allege specific facts indicating that the mark-ups charged by Merrill Lynch were in fact excessive. Under these circumstances, we believe that issue should be resolved by the district court in the first instance.[8]

### B.

We next address Ettinger's appeal of the district court's denial of her motion for class certification. In view of our holding concerning the grant of summary judgment, we will vacate the district court's order denying class certification and re-

mand this issue to the district court for prompt reconsideration, if appropriate.

### C.

 Finally, we address the pendent state law claims asserted by Ettinger. After examination of Merrill Lynch's motion for summary judgment and memorandum of law in support of the motion, we are satisfied that Merrill Lynch also sought to have these state law claims dismissed. Although the district court did not specifically address the pendent claims in its order, we believe that the order was intended to and did dismiss these state law claims. Since the district court presumably dismissed the state law claims because of its disposition of the federal claim, and since we are reversing that action, we will vacate the district court's dismissal of the pendent state law claims.

### III.

In light of the foregoing, the order of the district court granting Merrill Lynch's motion for summary judgment will be reversed, and the orders denying class certification and dismissing the pendent state law claims will be vacated. The case will be remanded to the district court for further consideration consistent with this opinion.

---

**7.** In its brief to this court, Merrill Lynch sets forth two alternative bases for the grant of summary judgment on the Rule 10b–5 claim: first, lack of scienter on the part of Merrill Lynch, *see Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), and second, the non-disclosure of mark-ups was not material in these transactions. Based on our examination of the record, it appears that these arguments were not presented to the district court. Therefore, we will not address them for the first time on appeal. Presumably, these issues would be appropriate for consideration by the district court on remand, if raised.

**8.** In its *amicus* brief to this court, the Securities Industry Association raises several issues not raised in the district court nor urged by either party in this court, namely that the SEC's *amicus* brief and release dated April 21, 1987 dealing with zero-coupon bonds represent a rule improperly issued in violation of the requirements of the Administrative Procedures Act, that requiring disclosures of "excessive" mark-ups would constitute a regulation of profits, and that National Association of Securities Dealers guidelines cannot be the basis for an implied claim under Rule 10b–5. Under the foregoing circumstances, we will not address these issues.