

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-19-1997

# Newton v. Merrill Lynch

Precedential or Non-Precedential:

Docket 96-5045

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"Newton v. Merrill Lynch" (1997). *1997 Decisions.* Paper 135.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/135

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed June 19, 1997

UNITED STATES COURT OF APPEALS

FOR THE THIRD CIRCUIT

No. 96-5045

KENNETH E. NEWTON; MLPF&S CUST. BRUCE ZAKHEIM

IRA FBO BRUCE ZAKHEIM

v.

MERRILL, LYNCH, PIERCE, FENNER & SMITH, INC.;

PAINEWEBBER INC.; DEAN WITTER REYNOLDS

(D.C. No. 94-cv-05343)

JEFFREY PHILLIP KRAVITZ

v.

DEAN WITTER REYNOLDS, INC.

(D.C. No. 95-cv-00213)

MLPF&S Cust. FPO -- Bruce Zakheim IRA FBO Bruce

Zakheim, Jeffrey Phillip Kravitz, and Gloria Binder,

Appellants

ON APPEAL FROM THE

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

Argued October 24, 1996

Before: STAPLETON and NYGAARD, Circuit Judges, and

MAZZONE,* Senior District Judge.
_____

*Honorable A. David Mazzone, United States District Court for the
District of Massachusetts, sitting by designation.

(Opinion filed June 19, 1997)

NORMAN S. POSER, ESQUIRE
 (Argued)
Brooklyn Law School
250 Joralemon Street
Brooklyn, NY 11201

KAREN L. MORRIS, ESQUIRE
 (Argued)
Morris & Morris
1105 North Market Street
Suite 1600
Wilmington, DE 19801

Attorneys for Appellants

MATTHEW D. ANHUT, ESQUIRE
JONATHAN N. EISENBERG,
 ESQUIRE (Argued)
Kirkpatrick & Lockhart
1800 Massachusetts Avenue, N.W.
Washington, DC 20036-5891

Attorneys for Appellee Merrill Lynch,
Pierce, Fenner & Smith, Inc.

JOSEPH A. BOYLE, ESQUIRE
Kelley, Drye & Warren
5 Sylvan Way
Parsippany, NJ 07054

BRUCE COOLIDGE, ESQUIRE
ROBERT B. McCAW, ESQUIRE
(Argued)
Wilmer, Cutler & Pickering
2445 M Street, N.W.
Washington, DC 20037-1420

Attorneys for Appellee
PaineWebber, Inc.

2

FRANK M. HOLOZUBIEC, ESQUIRE
Kirkland & Ellis
153 East 53rd Street
Citicorp Center
New York, NY 10022

Attorney for Appellee
Dean Witter Reynolds

RICHARD H. WALKER, ESQUIRE
ERIC SUMMERGRAD, ESQUIRE
SUSAN F. WYDERKO, ESQUIRE
JACOB H. STILLMAN, ESQUIRE
Mail Stop 6-6
Securities & Exchange
Commission
450 Fifth Street, N.W.
Washington, DC 20549

Attorneys for Amicus Curiae,
Securities & Exchange Commission

**OPINION OF THE COURT**

NYGAARD, <u>Circuit Judge</u>.

The issue on appeal is whether the over-the-counter customer order execution practices of several large stock brokers constituted securities fraud. The district court concluded that these practices were not fraudulent and granted summary judgment in favor of the defendants. We will affirm.

I.

The facts of this case are set forth thoroughly in the district court's opinion, <u>In re Merrill Lynch Securities Litig.</u>, 911 F. Supp. 754 (D.N.J. 1995). Succinctly stated, plaintiffs are investors who purchase and sell so-called "over the counter" securities which are traded on a computerized price quotation system known as NASDAQ. They claim that the peculiarities of this market have given securities dealers

an opportunity--upon which they have capitalized--to inflate their profit margins at the expense of customers, resulting in inferior execution prices vis-a-vis other dealers who have access to superior, privately quoted prices. These practices, plaintiffs allege, violated the defendants' duty of best execution, but were never disclosed by the dealers, thus amounting to a securities fraud under section 10 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(a) and Rule 10-b5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

The NASDAQ, which is now the second-largest securities market in the United States, is different from the New York and American Stock Exchanges, because it is a dealer-created, rather than an auction, market. In an auction market, buy and sell orders actually "meet" on the exchange floor, with prices being set by the continuous interaction of those orders, under the supervision of market "specialists." This type of market has traditionally been used for widely traded securities.

Dealer markets, on the other hand, rely on "market makers" to set prices and maintain the liquidity of securities. This system arose out of literal, over-the-counter trading of stocks that were not as widely traded as those listed on the NYSE or AMEX. In a dealer market, each market maker decides the prices at which it will buy and sell a security; the difference between the listed "ask" and "bid" prices is known as the "spread," from which the market maker is compensated for its efforts and risk.

Under that system, of course, as long as timely, accurate information is available regarding each market maker's prices, orders will naturally gravitate towards the dealer with the most favorable prices, and this will establish a single, albeit two-price, market for each security traded. NASDAQ (which stands for National Association of Securities Dealers Automated Quotation) is the information system that relays market makers' pricing information to buyers and sellers. NASDAQ quotes the National Best Bid and Offer--known in the industry as the "NBBO"--price for every stock on the system.

Because of recently created sources of additional, non-public pricing information, however, the NBBO may no

longer always be counted upon to display the "best" price. Systems such as SelectNet and Instinet, which are not available to all investors or even to all dealers, may be quoting a more favorable price than the NBBO at any given moment. Appellants allege that, not only were better prices displayed in many instances, but that the defendant dealers knew such prices were available, yet continued to book their orders at the inferior, NBBO price at the same time that they were trading at the more favorable price for their own accounts.

In addition, in many instances dealers are able to obtain more favorable prices by "crossing" the customer's order with the order of another customer. For example, assume that a dealer quotes an "ask" price of $32 1/4 and an "bid" price of $32 for shares of XYZ Corporation. A customer places an order to purchase 100 shares, but, unbeknownst to him, the dealer has an outstanding limit order from another customer to sell at 32 1/8. That dealer could simply cross the two orders and execute the trade at 32 1/8, saving the customer $12.50. The dealer would not incur any market risk on such a transaction. Appellants allege that it is a fraud for the defendant dealers to continue to execute trades at the NBBO price, appropriating the full "spread" as a fee for their services.

The district court granted summary judgment to defendants, for two principal reasons. First, it held that defendants made no actionable misrepresentations, because the duty of best execution is ill-defined and there is no widely accepted view that execution of trades at the NBBO price fails to satisfy that duty; thus, it would be improper to find that defendants omitted or concealed material facts. 911 F. Supp. at 771. Second, the court held that, even if defendants omitted information, they could not, as a matter of law, have acted with the requisite scienter. Id. at 772.

II.

A.

To make out a securities fraud claim under § 10 of the Securities Act of 1934 and Rule 10b-5, plaintiffs must

5

show: (1) a misrepresentation or omission of a material fact in connection with the purchase or sale of a security; (2) scienter on the part of the defendant; (3) reliance on the misrepresentation; and (4) damage resulting from the misrepresentation. Sowell v. Butcher & Singer, Inc., 926 F.2d 289, 296 (3d Cir. 1991). Although the district court held that there was no misrepresentation or omission of a material fact, we will assume, without deciding, that the trading practices here constituted an otherwise actionable misrepresentation, because we conclude that the district court correctly decided that scienter was lacking as a matter of law, and appellants' securities law claims fail on that basis alone.

The element of scienter has been defined as "a mental state embracing intent to deceive, manipulate or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12, 96 S. Ct. 1375, 1381 n.12 (1976). Scienter can also be established by a showing of recklessness, which is defined as "an extreme departure from the standards of ordinary care, . . . which presents a danger of misleading . . . that is either known to the defendant or is so obvious that the actor must have been aware of it." Healey v. Catalyst Recovery, Inc., 616 F.2d 641, 649 (3d Cir. 1980) (quoting Sundstrand v. Sun Chemical Corp., 553 F.2d 1033, 1045 (7th Cir. 1977)). The recklessness standard comprehends actions very close to intentional conduct; mere indifference to the consequences of a statement is not sufficient. Healey, 616 F.2d at 649.

Appellants assert, nevertheless, that the record before the district court contained sufficient evidence from which a rational factfinder could infer scienter. The district court disagreed, opining that because the duty of best execution is not "established," but ambiguous, the failure to disclose that all orders were being executed at the NBBO price could not, as a matter of law, have involved scienter. We agree.

Appellants attempt to refute the district court's reasoning by arguing that "the absence of a regulation prohibiting a specific practice does not mean such practice cannot be considered fraudulent." Specifically, they rely on our decision in Ettinger v. Merrill Lynch, Pierce, Fenner & Smith,

6

Inc., 835 F.2d 1031 (3d Cir. 1987), which they assert is "directly on point." We are not persuaded.

It is true that Ettinger involved a securities firm that failed to disclose excessive markups, but there the similarity to this case ends. The dealer in Ettinger argued that its compliance with Rule 10b-10 insulated it from a material misrepresentation attack under Rule 10b-5, and we held simply that such compliance did not preclude a 10b-5 action. Id. at 1036. Moreover, Ettinger involved a markup practice that both the SEC and the courts had already condemned--the duty in that instance, unlike here, was clear. See id. at 1033. And finally, scienter was not even an issue in Ettinger. It had been waived in the district court. Id. at 1036 n.7. Ettinger is inapposite.

Appellants also cite several cases which allegedly stand for the proposition that violations of § 10(b) can occur when a broker-dealer fails to execute customer orders at the best possible price. Two of those cases, however, involved execution practices that no reasonable dealer could have possibly believed proper. See Barnett v. United States, 319 F.2d 340, 345 (8th Cir. 1963) (excessive mark-ups of between 25 and 67% not disclosed; customer order never executed at advertised price, while dealer was trading same security for its own account at superior price); Opper v. Hancock Securities Corp., 250 F. Supp. 668, 673 (S.D.N.Y.), aff'd, 367 F.2d 157 (2d Cir. 1966) (dealer claimed to be searching unsuccessfully for buyer to purchase customer's stock, while at the same time trading in that same stock profitably for its own account). Three other cases interpose a third-party dealer in the transaction, thus increasing the customer's expense; this practice had already been condemned by long-standing judicial and regulatory authority. See Sinclair v. SEC, 444 F.2d 399, 400 (2d Cir. 1971); In re Delaware Management Co., 43 SEC 392, 399-400 (1967); In re Hoit Rose & Co., 1969 SEC LEXIS 244 (1969).1

_____

1. Indeed, the only authority appellants are able to cite with facts similar to the present case is an unpublished district court opinion in typescript, Lesko v. Merrill Lynch, Pierce, Fenner & Smith, Inc., No. C78-1740 (N.D. Ohio June 22, 1979), in which the court opined, with very little analysis, that a deliberate policy of sending all orders to the AMEX rather than "seeking the best price in the available markets" stated a claim for securities fraud. That court did not discuss scienter, and is thus inapposite, whatever its relative persuasiveness.

7

As the district court recognized, the most instructive case on the issue of scienter is Platsis v. E.F. Hutton & Co., 946 F.2d 38 (6th Cir. 1991). There, a broker failed to disclose its production credits, spreads or markups, while at the same time it was profiting from customer transactions against its own inventory. The district court found, after trial, that defendants had acted with scienter, but the court of appeals reversed because there was no established regulatory duty to disclose and intent to deceive could not thus be established by omission. Here, as in Platsis, the dealers were under no established duty to execute trades at other than the NBBO price or to disclose their execution practices. Indeed, it appears that the industry as a whole used the NBBO to satisfy the duty of best execution. Under the reasoning of Platsis, then, which we adopt, there was no scienter. Accord Shivangi v. Dean Witter Reynolds, Inc., 825 F.2d 885, 889 (5th Cir. 1987) (failure to disclose sales compensation did not involve scienter when no court or regulator had ever held that information material and there was no evidence that its disclosure was normal industry practice).2

On the other hand, in Chasins v. Smith, Barney & Co., 438 F.2d 1167 (2d Cir. 1970), a broker failed to disclose that it was making a market in certain securities it strongly recommended, and then sold, to plaintiff. Although scienter was not directly at issue in Chasins, the court did opine that all brokerage firms had followed the same practice and had never thought such disclosure was required. Moreover, the SEC had never prosecuted any firm for this violation.

_____

2. The district court and appellees maintain that this circuit already follows a Platsis-like rule. In Christidis v. First Pennsylvania Mortgage Trust, 717 F.2d 96 (3d Cir. 1983), plaintiffs sued an accounting firm, alleging that it fraudulently failed to preparefinancial statements in accordance with generally accepted accounting principles. Although scienter as such was not an issue, we affirmed the dismissal of the complaint for lack of particularity in pleading fraud under Fed. R. Civ. P. 9(b). Id. at 100. We do not read Christidis as itself adopting the proposition that failure to disclose cannot involve scienter where there is no clear duty to do so and the practice at issue is common in the industry. It was simply a case involving the pleading standard for allegations of fraud. Nevertheless, we think that Platsis is persuasively reasoned and we adopt it here.

8

Indeed, as here, the practice at issue in Chasins was later addressed by regulation. Id. at 1171 n.5.

Nevertheless, we decline to apply Chasins to this fact pattern. First, the holding there did not address scienter. See Architectural League v. Bartos, 404 F. Supp. 304, 315 (S.D.N.Y. 1975) ("All that . . . Chasins holds . . . is that failure to disclose market-maker status was . . . the omission of a material fact. The omission of a material fact, without more, does not violate Rule 10b-5. All other elements, including scienter, must be proven[.]"). Second, in Chasins, appellant's contention that nobody thought disclosure was required was demonstrably false, having been impeached by appellant's own witness. 438 F.2d at 1171. That is not the case here. Finally, and most importantly, in Chasins the dealer was strongly recommending that the customer buy certain securities in which the dealer itself was making the market. The dealer thus had an undisclosed conflict of interest of major proportions; to the extent that the customer followed its "advice," the dealer made more money. See Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 482 F.2d 880, 885 (5th Cir. 1973) (distinguishing Chasins on this basis); Batchelor v. Legg & Co., 52 F.R.D. 553, 557 (D. Md. 1971) (similar).

We therefore hold that, where defendants are under no affirmative legal duty to disclose their order execution practices and those practices are widely followed within the securities industry, as a matter of law there is no scienter when defendants fail to disclose those practices.

B.

In this case, although it appears on the surface that appellants have adduced evidence that the nondisclosures at issue here were not common industry practice, closer examination reveals that contention to be unsupported. Appellants first cite the deposition testimony of Paul M. Lacy, a retired securities trader, for the proposition that "other broker-dealers do not execute customer orders with exclusive reference to the NBBO." His testimony supports nothing. Mr. Lacy retired before the beginning of the class period (November 1992), and therefore cannot offer any

9

competent, firsthand testimony about industry practices as they existed at the times material to this litigation. Of even greater significance, Lacy did not even testify about the practices of other securities dealers in general or even his former firm in particular, but testified only about his own practices as a trader within that firm.

Appellants also rely on proposed SEC rules on order execution as confirmation of Lacy's testimony [A 609]. See Order Execution Obligations, 60 Fed. Reg. 52,792 (1995) (to be codified at 17 C.F.R. pt. 240) (proposed Oct. 10, 1995). That document recites that traders use "a variety of systems and procedures" to satisfy best execution. Id. at 52,794. If traders use a variety of systems, however, that bolsters the district court's conclusion that there was no clear duty to supplement the NBBO price and that failure to disclose the practice of executing all trades at the NBBO price could not have involved scienter.

Appellants likewise refer us to the opinions of a trader and a former SEC commissioner who believe that the duty of best execution requires affirmative efforts to supplement the NBBO with other sources of pricing. See National Market System: Hearings Before the Subcomm. on Telecommunications & Finance of the Comm. on Energy & Commerce, 103d Cong., Serial No. 103-67, at 355 (1993) (statement of securities dealer Bernard L. Madoff that he believes it is the obligation of a market maker to achieve price improvement whenever possible and does so infifty percent of all trades); Declaration of former SEC Commissioner Richard Y. Roberts, [A777] ("[i]t would be inconsistent with the duty of best execution for a broker-dealer to advantage itself by automatically executing customer orders at the NBBO when superior prices are reasonably available"). This evidence, however, is insufficient.

To prevail on summary judgment, one need not show that every dealer executes trades at the NBBO price, but merely that enough dealers do so that the duty to supplement the NBBO price is ambiguous and scienter is negated. There is more than ample evidence of that. David S. Ruder, a former Chairman of the SEC, member of the NASD board and law professor at Northwestern University,

10

stated by affidavit that trades at the NBBO price satisfied the duty of best execution and that the general custom and practice of firms in the industry was to execute at the NBBO price [A225-27]. T. Grant Callery, General Counsel to NASD, also stated by affidavit that NASD views the NBBO price as satisfying the best execution duty [A 458]. Finally, Hugh Quiqley, a trader at Merrill Lynch, declared that he had observed the trading practices of every major firm in the industry and observed that the standard practice was to trade at the NBBO [A 497].

Finally, while this case was pending on appeal, the SEC finalized new regulations pertaining to order execution which address directly the practices at issue here. See generally Self-Regulatory Organizations; National Association of Securities Dealers; Order Granting Partial Approval and Notice of Filing and Order Granting Accelerated Approval of Amendment No. 1 to Proposed Rule Change Relating to Implementation of the Commission's Order Handling Rules, 62 Fed. Reg. 2415 (Jan. 16, 1997). Under these new rules, which became effective on January 20, 1997, market makers must display a customer's limit order when the price of that order is superior to the current NBBO quote. Moreover, any superior prices quoted on electronic communications networks such as SelectNet and Instinet must be listed as part of the NBBO price. See SEC News Release 97-3, New Trading Rules for NASD and the Exchanges, 1997 WL 21042 (Jan. 20, 1997). By these regulatory changes, dealers will essentially be required to eliminate the practices that appellants complain of in this case. We believe, as did the district court, that the fact that the Securities and Exchange Commission perceived the need to address these order execution practices through the regulatory process indicates strongly, if not conclusively, that the "duty" to cross orders and to look beyond the NBBO for pricing information was ambiguous, indeed speculative, during the class period. Regulatory agencies would not spend the time, money and effort in promulgating regulations if the duty it sought to impose were already clear under established law.3

---

3. We do not mean to imply, however, that the duty of best execution is in any way unenforceable in a private action under § 10(b) of the 1934

11

III.

In sum, the evidence in this record is legally insufficient for a rational jury to infer that defendants failed to disclose their "NBBO-only" execution policy knowing that it was fraudulent not to do so, or that they recklessly ignored massive evidence suggesting that it was. Accordingly, the district court correctly found no scienter and properly entered summary judgment for defendants. We will affirm.

_____

Act. Where the duty is clear, or where a practice is obviously fraudulent and not pervasive throughout the securities industry, the mere lack of regulations directly addressing the practice at issue will not constitute a bar to such a suit.

12

STAPLETON, Circuit Judge, dissenting:

During the class period, Section 10(b) and Rule 10(b)-5 (hereafter referred to collectively as "Section 10(b)") imposed upon the defendants a duty not to deliberately mislead their clients. The plaintiffs allege that, when the defendants received the plaintiffs' orders, the defendants knew both (1) that the plaintiffs expected them to execute these orders at a better price than the NBBO if the opportunity to do so presented itself, and (2) that the defendants themselves had no intention of referencing anything other than the NBBO. The issue for decision is whether the plaintiffs have produced sufficient evidence from which a trier of fact could reasonably infer that one or more of the defendants had this state of mind when they accepted the plaintiffs' orders for execution. I conclude that they have and that summary judgment for the defendants is therefore improper.

I.

The class period extends from November 4, 1992 to November 4, 1994. The district court granted summary judgment to the defendants primarily because the SEC, during that period, had not explicitly declared that the duty of best execution included the duty to consult reasonably available sources other than NBBO. Because resolving that issue involved considerations within the scope of the SEC's expertise, the district court believed it would be inappropriate for the courts to recognize a legal duty to consult other sources during the class period. I find the district court's approach unacceptable because it mistakenly equates the SEC's lack of guidance with an absence of any relevant law.

Our court reaches a somewhat different conclusion. It finds that the SEC's post-class period decision effectively eliminating the practices of which the plaintiffs here complain1 "indicates strongly, if not conclusively, that the

_____

1. The SEC proposed in 1995, and implemented in 1997, amendments to the "Quote Rule" which now require market makers to include in the NBBO any superior price they are quoting on electronic communications networks like SelectNet or Instinet. See Order Execution Obligations,

13

`duty' to . . . look beyond the NBBO for pricing information was ambiguous, indeed speculative, during the class period." Slip Op. at 11. The court then concludes that there was applicable law during the class period and that it was established by the way in which a segment of the regulated profession behaved during that period. Thus, the defendants are entitled to summary judgment, we are told, because they have shown "that enough dealers [referenced only the NBBO during the class period] so that the duty to supplement the NBBO price [was] ambiguous and scienter is [therefore] negated." Id. at 10 (emphasis omitted).

I believe that Congress established the principles of law applicable here when it enacted Section 10(b) and that these principles were not ambiguous during the class period. The district court's task was to apply those unambiguous principles to the circumstances of each transaction between a plaintiff and a defendant. Because there are material disputes of fact concerning those circumstances, I would reverse and remand for further proceedings.

II.

The relationship between a client and a broker is that of a principal and an agent. Absent special circumstances, it is a relationship in which it is understood by all that the client-principal seeks his own economic gain and the broker-agent earns his commission by helping the client-principal achieve that objective. Absent instructions to the contrary, the broker is thus expected to maximize the economic benefit to the client in each transaction. Hence, the duty of best execution.

"[T]he duty of best execution requires a broker-dealer to seek the most favorable terms reasonably available under

_____

Exchange Act Release No. 36,310, 60 Fed. Reg. 52972 (Oct. 10, 1995) ("Proposed Rules"); Order Execution Obligations, Exchange Act Release No. 37,619A, 61 Fed. Reg. 48290 (Sept. 12, 1996) ("Final Rules"). Since the new NBBO incorporates a far wider range of prices, the possibility of executing a trade at an inferior NBBO price when better prices are available on an electronic communications network has been eliminated.

14

the circumstances for a customer's transaction." Proposed Rules, 60 Fed. Reg. at 52793; U.S. Equity Market Structure Study, Exchange Act Release No. 30,920, 57 Fed. Reg. 32587, 32595 (July 22, 1992); see generally Restatement of Agency (2d) § 424 (1958) (stating that agent must "use reasonable care to obtain terms which best satisfy the manifested purposes of the principal"). That is, the duty of best execution requires the defendants to execute the plaintiffs' trades at the best reasonably available price.[2] While there may be uncertainty in any particular situation as to what prices are reasonably available, the existence of a broker-dealer's duty to execute at the best of those prices that are reasonably available is well-established.

The set of prices that are reasonably available to a broker-dealer is constantly fluctuating. Therefore, determining what satisfies the duty of best execution is a highly fact-and-circumstance-sensitive inquiry, with the scope of the duty evolving over time with changes in technology and transformations in the structure of financial markets. See, e.g., Final Rules, 61 Fed. Reg. at 48322-23. For example, before the creation of NASDAQ, a broker in an over-the-counter market satisfied her duty of best execution by contacting at least three market makers prior to executing a client's order. See Proposed Rules, 60 Fed. Reg. at 52793. With the advent of NASDAQ, and the NBBO computer system providing instant access to the best bid and offer available nationwide, the standard for satisfying the duty of best execution necessarily heightened.

_____

2. Other terms in addition to price are also relevant to best execution. In determining how to execute a client's order, a broker-dealer should take into account order size, trading characteristics of the security, speed of execution, clearing costs, and the cost and difficulty of executing an order in a particular market. See, e.g., Payment for Order Flow, Exchange Act Release No. 33,026, 58 Fed. Reg. 52934, 52937-38 (Oct. 13, 1993). When the plaintiffs state that better "prices" were reasonably available from sources other than the NBBO, I understand that to mean that, given an evaluation of price as well as all of the other relevant terms, the trade would be better executed through a source of liquidity other than the NBBO (e.g. SelectNet, Instinet, in-house limit orders or market orders held by the defendants, or limit orders placed by the public in the Small Order Execution System). Similarly, for convenience, I use the phrase "best reasonably available price" to mean "best terms."

15

The record reflects a genuine dispute of fact as to whether prices better than those on the NBBO were reasonably available from sources other than the NBBO at the time the defendants executed the plaintiffs' trades at the NBBO price. There is sufficient evidence from which a reasonable trier of fact could find, for example, that prices better than the NBBO were reasonably available on the SelectNet and Instinet at the very moment that the defendants chose to execute the plaintiffs' orders at the NBBO price. The defendants have suggested that consulting other sources besides the NBBO would have added substantial expense and delay to the execution of plaintiffs' orders, more than offsetting any improvements that might have been available in terms of price. See Tr. Oral Arg. at 28-29. This, however, is clearly a factual dispute, which we are not permitted to resolve in favor of the defendants at this juncture.

I believe the evidence is sufficient to allow a reasonable trier of fact to conclude that, by the time of the class period, both technology and over-the-counter markets had developed to a point where it was feasible to maximize the economic benefit to the client by taking advantage of better prices than the NBBO.

III.

Recovery for federal securities fraud requires a showing of deliberate or reckless misrepresentation of a material fact. The misrepresentation here, according to plaintiffs, was an implied representation made by the defendants when they agreed to execute the plaintiffs' orders that they would maximize the plaintiffs' economic gain in the transaction. Plaintiffs' orders did not specify the price at which they were to be executed. It is at least a reasonable inference, plaintiffs therefore insist, that they would not have placed these orders with the defendants without an understanding that the defendants would execute them in a manner seeking to maximize plaintiffs' economic benefit. Since the defendants knew of the plaintiffs' profit motivation, they must have understood that plaintiffs would expect them to obtain a price more advantageous to the plaintiffs than the NBBO when one was readily available. If,

16

as plaintiffs allege, the defendants intended not to act in a manner consistent with this expectation when they accepted the orders and yet did not so advise plaintiffs, the defendants can be found to have made an implied representation that they knew to be false.

In addition to these inferences that can be drawn from an economic analysis of the plaintiffs' relationship with the defendants, plaintiffs rely upon evidence showing that respected members of the brokerage community recognized, even prior to the class period, that trades were readily available from sources other than the NBBO and that their clients expected them to take advantage of those sources whenever it would benefit the client. See, e.g., Declaration of Paul M. Lacy [A 718]; Declaration of Junius W. Peake [A 755]; Declaration of Richard Y. Roberts [A 775]. Moreover, the plaintiffs have shown that the SEC found clear evidence of a two-tiered market during the class period, in which NASDAQ market makers routinely traded at one price with retail clients like the plaintiffs and at a better price for themselves through quotation services like SelectNet and Instinet. See Final Rules, 61 Fed. Reg. at 48307-08. They have further shown that the possibility that the duty of best execution might require resort to sources other than the NBBO was being actively debated during the class period and that that debate ultimately resulted, after the class period, in a regulation effectively requiring as much. Id.

All of this would allow a reasonable trier of fact to find that the defendants' misrepresentation--namely, that they would execute plaintiffs' trades in a manner maximizing plaintiffs' economic gain--was at least reckless, if not intentional. See Healey v. Catalyst Recovery of Penn., Inc., 616 F.2d 641, 649 (3d Cir. 1980) (defining recklessness as an extreme departure from ordinary care). Certainly, then, scienter can be found on this record.

To be sure, as the court's opinion stresses, the defendants have countered with affidavits of other respected members of the brokerage community stating that their practice during the class period was the same as that of the defendants. This evidence could, of course, be regarded by a trier of fact as probative of the defendants' state of mind when they accepted plaintiffs' orders. But

17

these affidavits do no more than raise a material issue of fact as to whether the defendants knew of the expectation plaintiffs claim to have had; they do not settle the matter.

At trial, the defendants would certainly be entitled to argue to the jury that, because of industry practice, they thought their clients would expect them to execute only at the NBBO or that they never thought about their clients' expectations. Moreover, any evidence, derived from knowledge of industry practice or elsewhere, that the plaintiffs were generally aware of the defendants' exclusive reliance on the NBBO would, of course, be quite probative of whether the plaintiffs had the expectations they claim. But the court, in elevating the practice of a segment of the industry to be outcome determinative, loses sight of the fact that the basis for the duty of best execution is the mutual understanding that the client is engaging in the trade--and retaining the services of the broker as his agent--solely for the purpose of maximizing his own economic benefit, and that the broker receives her commission because she assists the client in reaching that goal. Based on this mutual understanding and the absence of any express limitations on the brokers' responsibility, a trier of fact could find that the defendants understood that they were expected to utilize sources other than the NBBO when a better price was readily available.

IV.

As I understand the court's analysis, a Section 10(b) defendant might be granted summary judgment even if her regular practice violated the duty of best execution, and she knew or should have known that it violated that duty, so long as she can identify a sufficient number of other broker-dealers engaged in the same wrongful conduct to be able to argue in good faith that the underlying duty was "ambiguous." I cannot accept an analysis that will produce such a result.

Even a universal industry practice may still be fraudulent. See Chasins v. Smith, Barney & Co., 438 F.2d 1167, 1171-72 (2d Cir. 1970) (non-disclosure of widespread industry practice may still be non-disclosure of material

18

fact); <u>Opper v. Hancock Securities Corp.</u>, 250 F. Supp. 668, 676 (S.D.N.Y. 1966) (industry custom may be found fraudulent, especially on first occasion it is litigated); <u>see also Vermilye & Co. v. Adams Express Co.</u>, 88 U.S. 138, 146 (1874). Indeed, the SEC recently completed an investigation in which it found that widespread fraud was occurring in the NASDAQ market during a period overlapping the class period. <u>See</u> Report Pursuant to Section 21(a) of the Securities Exchange Act of 1934 Regarding the NASD and the NASDAQ Market (Aug. 8, 1996).

As the court emphasizes, the practice of exclusive reliance on the NBBO has never been held to be fraudulent by any court or regulator. But neither is there any statute, rule, regulation, or interpretation, by the SEC or by a court, that authoritatively establishes that exclusive reliance on the NBBO, even when better prices are reasonably available, satisfies the duty of best execution. Whether the NBBO exhausted the category of "reasonably available prices" during the class period has thus never been expressly determined. But this did not absolve the district court of the duty to resolve the plaintiffs' securities fraud claim once it was presented in this suit.

"In the final analysis, ultimate responsibility for construction and enforcement of the securities laws must rest with the court." <u>Langert v. Q-1 Corp.</u>, Fed. Sec. L. Rep. (CCH) para. 94,445, at 95,540, 1974 WL 377 (S.D.N.Y. Mar. 15, 1974). The district court was not deprived of this enforcement authority just because no court or regulator had previously chosen to exercise such authority with respect to the practice challenged here. <u>See, e.g., Chasins</u>, 438 F.2d at 1171-72 (finding that defendant's failure to disclose its market maker status was material omission under Section 10(b), despite fact that SEC had never previously held that such disclosure was required).

V.

On the record before us, I believe a reasonable trier of fact could conclude that the defendants misrepresented that they would execute the plaintiffs' orders so as to

maximize the plaintiffs' economic benefit, and that this misrepresentation was intentional or reckless because, at the time it was made, the defendants knew that they intended to execute the plaintiffs' orders at the NBBO price even if better prices were reasonably available. A reasonable trier of fact could find scienter with respect to a material misrepresentation, as well as the other elements essential to a Section 10(b) fraud claim. Accordingly, I must respectfully dissent.

A True Copy:
Teste:

<u>Clerk of the United States Court of Appeals</u>
<u>for the Third Circuit</u>

20